Peary PERRY and Municipal
Collections, Inc.,
Appellants,

v.

George GREANIAS, Appellee.

No. 01–99–00199–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 27, 2002.

Rehearing Overruled Dec. 27, 2002.

Lanelle L. McNamara, McNamara & McNamara, Waco, Theresa Mobley, Joseph M. Hill, Cage, Hill & Niehaus, L.L.P., Houston, for Appellant.

Daniel K. Hedges, Susan Louise Kopecky, Porter & Hedges, L.L.P., Anthony W. Hall, Jr., City Attorney-Houston, Houston, for Appellee.

Panel consists of Justices MIRABAL, JENNINGS, and DUGGAN.*

## OPINION ON REHEARING

MARGARET GARNER MIRABAL, Justice.

We deny appellant's motion for rehearing, withdraw our opinion and judgment dated May 23, 2002, and substitute this opinion in its stead.

Appellant, Peary Perry, sued appellee, George Greanias, former City of Houston Controller, alleging libel, slander, intentional infliction of emotional distress, and violations of his constitutional due process and free speech rights.[1] Perry challenges the trial court's granting of Greanias's motion for summary judgment based on various affirmative defenses of immunity and privilege. We address whether Greanias established the affirmative defenses of official immunity and qualified immunity, as a matter of law, entitling him to summary judgment. We affirm in part and reverse and remand in part.

## FACTUAL BACKGROUND

### A. The Contract

On May 5, 1993, the City of Houston entered into a contract with Municipal Collections, Inc. (MCI) to collect delinquent traffic tickets. During the contract's term, Peary Perry was MCI's president and chief executive officer, as well as its majority shareholder.

Pursuant to the contract, MCI was to be paid a contingency fee of 28% of the revenues it collected; the contingency fee was to be paid solely from monies collected by MCI. The contract stated that the director of the Municipal Courts Administration Department (MCAD) "shall have the exclusive right to approve the amount and payment of any monies due to [MCI] under this Contract" and that payment would be made to MCI when MCAD's director

---

*The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. Municipal Collections, Inc. was also a party in the trial court. However, on September 14, 2000, we issued an interlocutory order granting the unopposed motion of Municipal Collections's chapter 7 bankruptcy trustee to dismiss Municipal Collections's appeal. Our opinion and judgment of today's date incorporate that order by reference.

receives and approves an MCI invoice. With regard to payment, the contract also stated,

> The City [of Houston] shall review each invoice and, within (15) working days after its receipt, either approve it and deliver it to the Controller's office for payment, or return it to [MCI] with a statement of the reasons for its rejection or non-approval. The City shall make payment within 30 days of approval of [MCI's] invoice.

From June 1993 through October 1994, MCAD's director, Larry Miller, approved, and the Controller's Office paid, MCI's invoices. Over a two-year period, MCI received $3,000,000 from the city for its services.

To comply with the city's affirmative action policy, MCI subcontracted with Bayou City Enterprises (BCE), a minority-owned business. The subcontract provided that BCE will "manage in close coordination with MCI the systemic noticing of all alleged Violators provided by the CITY and MCI." In return for its services, BCE was to receive 19% of MCI's 28% contingency fee; however, the subcontract also provided that BCE would pay MCI a monthly fee of $11,500 toward MCI's "operating expenses."

## B. The Audit

George Greanias served as City of Houston Controller during the contract's term. As controller, Greanias was required to conduct audits on requests for payment submitted to the city.[2] One type of audit performed by Greanias's office was the "contract compliance audit" to determine whether the city was assuring compliance with the terms and conditions of contracts to which it was a party. In November 1994, the Controller's Office began a compliance audit of the MCI contract.

The audit covered the contract period of May 5, 1993, through March 31, 1995. Its stated purpose was to determine (1) whether MCI delivered the collection services it was contracted to provide, and (2) whether fees were paid to MCI according to the contract terms. Early in the auditing process, the Controller's Office began an investigation into the services provided by BCE; however, BCE refused to cooperate with the investigation. With regard to this investigation, the audit states: "The Controller's Office published a report [in January 1995] concluding that BCE had not provided sufficient, competent and relevant evidence necessary to demonstrate that BCE was providing a commercially useful function to the City." In December 1994, the Controller's Office began withholding the portion of payment to BCE (i.e., the 19% of the 28% contingency payment) from payments made to MCI. The Controller's Office continued its audit of the MCI contract in March 1995.

The audit was published in July 1995; the auditors concluded as follows:

> [MCAD] management cannot provide reasonable assurance that the terms of the [MCI] contract have been followed. Major contract terms and provisions have not been complied with. Most of the contract deviations benefitted the contractor and have resulted in higher cost or less service to the City. We estimate that the cost to the City resulting from not adhering to the contract terms has been $1,044,000.

Some of the more significant audit findings were summarized as follows:

2. *See* HOUSTON, TEX., CITY CHARTER art. VIII, § 3 (Act of 1905; added by amend. Oct. 15, 1913).

1. The Contract has not been properly administered. Major contract deviations have been permitted without approval from City Council. Most of the findings noted below are the result of deviations from contract terms and we estimate their cost to the City to be in excess of $1,044,000.

2. MCI did not process mail payments as required by the contract. The City incurred additional cost of approximately $300,000 in processing the mail payments for MCI.

3. MCI has withheld $207,000 from the 19% of gross revenue that the contract provides should have been paid to [BCE].

4. The City paid approximately $95,000 in fees to MCI for tickets on which bonds were posted by the alleged violators after tickets were assigned to MCI. Under the terms of the contract, MCI is not entitled to a fee on these tickets.

5. The date first notices are sent was not documented in MCI's computer database. Incorrect first notice dates were used by MCAD to determine MCI's entitlement to a fee, thus resulting in an overpayment to MCI of approximately $102,000.

6. The City paid MCI approximately $118,000 on tickets that the assignment term exceeded the 210–day limit imposed by the contract.

7. [MCI] did not provide the performance and payment bonds required by the contract. We estimate that MCI was able to avoid $112,000 of operating costs by not having to purchase these bonds.

8. Fees of approximately $110,000 were paid to MCI on tickets that, under the contract were not eligible for assignment because they were not at least 30 days delinquent.

The published audit also incorporated MCAD's and the Houston City Attorney's responses to the audit's findings. Generally, both MCAD and the city attorney disagreed with most of the audit's findings.

Peary Perry's name is not mentioned in either the published audit or in the transmittal letter from Greanias to then-City of Houston Mayor Bob Lanier, which forwards the audit and summarizes some of the audit's findings and conclusions. Issues relating to how or why the city selected MCI as the successful contractor were also not discussed in the audit.

Following the publication of the audit, Greanias withheld payment of $315,000 of the amount billed by MCI. Mayor Lanier terminated the MCI contract in August 1995. In a press release, Mayor Lanier stated as follows:

MCI has been rendered incapable of performing under its contract as a consequence of payments actually withheld by the Controller, future payments that he says he will withhold, and other payments that he says he may withhold.... I want to limit the City's potential liability as much as I can by an early termination of the contract. With the August withholding, the total amount withheld [from MCI] should approximate $375,000. I am led to believe that the issue of who owns what part of this money will be resolved by litigation.

## PROCEDURAL HISTORY

Following the termination of the MCI contract, Perry and MCI filed suit against the City of Houston and Greanias in his individual and official capacities. The claims relevant to this appeal are Perry's claims against Greanias individually for libel, slander, and intentional infliction of emotional distress, as well as constitutional

claims alleging violations of Perry's (1) federal constitutional due process and free speech rights enforceable under 42 U.S.C. section 1983 and (2) Texas constitutional rights to free speech and due process.

In support of his claims, Perry offered the following factual allegations in his second amended petition:[3]

Unbeknownst to Perry, as of January, 1995, GREANIAS was specifically told that HOUSTON's legal counsel had determined that GREANIAS' refusal to pay the full amount due under the contract had no legal basis and that his continued refusal to pay the full amount due under MCI's contract could be a violation of the "14th amendment to the U.S. Constitution as well as the Civil Rights Act" and that "city employees" could also be "personally liable for participating in any illegal withholding of funds." ... Thus, Greanias, individually and as City Controller for the City of Houston, had actual notice of an established constitutional right that inured to the benefit of Perry, individually, and MCI; and GREANIAS had actual notice of the fact that his actions could be a violation of the constitutional provision prohibiting the taking of property without the due process of law. Nonetheless, GREANIAS persisted in withholding funds due and owing MCI.

. . . .

After Perry spoke out about the illegality of withholding 19% of the funds due to MCI, and after Perry grieved GREANIAS' actions to the Affirmative Action Committee, and after Perry was successful in obtaining an affirmation of the legality of MCI's subcontract with BCE, GREANIAS sent another team of auditors to audit the records of MCI. This time the audit spanned a time period beginning in March of 1995 and continuing into June, with a written report issued in July, 1995.

. . . .

On July 18, 1995, GREANIAS released to the press his audit report and began publically accusing MCI and PERRY, individually, of overcharging HOUSTON in excess of one million dollars in violation of the contract. Daily press coverage continued and GREANIAS repeatedly issued statements including the same allegations of wrongdoing on the part of MCI and PERRY, individually. The public accusations of wrongdoing made by GREANIAS, individually, and as the agent of HOUSTON, were false.

. . . .

During October and November of 1995, GREANIAS increased the scope of his public comments to include accusations that the contract let to MCI was related to political and personal connections between PERRY, individually, and the mayor of HOUSTON, Bob Lanier, who was running for re-election. Prior to the publication of GREANIAS' accusations that the collection contract was a political favor from Lanier to PERRY, GREANIAS, and his staff, had conducted an investigation into the process by which the collection contract was awarded to MCI; and GREANIAS knew or, absent reckless disregard, should have known that PERRY was not even associated with MCI at the time that MCI was selected by HOUSTON as the preferred contractor for the collection contract.

Also beginning in late September, GREANIAS suggested to the press that the matter had been referred to the FBI

---

3. In the trial court, the claims against Greanias were different from the claims against the City of Houston; this appeal involves only claims against Greanias.

for investigation. From that time through the November election, news stories focused on the potential for criminal charges to be brought by the FBI including allegations that "competition for the contract was [rigged] in PERRY's favor." The public disclosure of FBI involvement clearly imputed criminal activity to PERRY, individually, thereby stigmatizing PERRY's name, and damaging his personal reputation, as well as the reputation of the company. The charges of criminal activity against PERRY and publicized by GREANIAS, individually, and, as the agent of HOUSTON, were false.

Greanias moved for summary judgment on Perry's claims against him on the following theories: (1) absolute privilege—based on quasi-judicial and executive privilege, (2) official immunity, and (3) qualified privilege. The trial court granted Greanias's motion for summary judgment and entered a take-nothing judgment on Perry's claims against Greanias, but did not state the grounds for its decision in the order. Greanias obtained a severance of Perry's claims against him, rendering the summary judgment final for purposes of this appeal. In three issues, Perry challenges the propriety of the bases underlying the summary judgment.

## SUMMARY JUDGMENT STANDARD OF REVIEW

In a summary judgment case, the issue on appeal is whether the movant met its summary judgment burden by establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Calvillo v. Gonzalez*, 922 S.W.2d 928, 929 (Tex.1996). The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Rhone–Pou-*

*lenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex.1999).

■■■ A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). To conclusively prove all of the elements of the affirmative defense, the movant must present summary judgment evidence that establishes each element of the affirmative defense as a matter of law. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex.1996). If the defendant meets this burden, the plaintiff must then produce evidence raising a genuine issue of material fact to avoid the affirmative defense. *Nichols v. Smith*, 507 S.W.2d 518, 520–21 (Tex.1974); *Gonzalez v. City of Harlingen*, 814 S.W.2d 109, 112 (Tex.App.-Corpus Christi 1991, writ denied). When a trial court does not state the basis for its decision in its summary judgment order, as in this case, we must uphold the order if any of the theories advanced in the motion is meritorious. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex.1996); *Cigna Ins. Co. v. Rubalcada*, 960 S.W.2d 408, 412 (Tex.App.-Houston [1st Dist.] 1998, no pet.).

## DISCUSSION

In Perry's first issue, he presents three separate arguments in support of his position that Greanias failed to meet his burden to establish his defensive theories of official immunity, absolute privilege, or qualified privilege: (1) Greanias failed to prove that the City of Houston, and Greanias, as an agent of the city, engaged in a governmental function, rather than a proprietary function; (2) even if the city engaged in a governmental function, Greanias failed to produce sufficient evidence to prove that he was engaged in governmental activity, as opposed to administrative

activity; and (3) Greanias failed to produce sufficient evidence to prove that his actions were discretionary, rather than ministerial, or that he acted in good faith. Although this is a multifarious issue, we will address each properly raised contention necessary for the issue's disposition. *See* TEX.R.APP. P. 38.1(e).

As a preliminary matter, we note that Perry's state and federal constitutional claims are based on Greanias's actions related to conducting and acting on the audit; however, Perry's claims for slander, libel, and intentional infliction of emotional distress are based on two separate and distinct grounds: (1) Greanias's conduct and statements relating to the audit, and (2) Greanias's alleged defamatory statements made after the audit was published. Therefore, we will separately analyze each of these grounds to determine whether the affirmative defenses and immunity theories asserted by Greanias in his motion for summary judgment apply to either or both grounds.

## A. Actions Relating to Conducting the Audit and Acting on its Findings

### 1. *Official Immunity*

■ In his motion for summary judgment, Greanias asserted that he is entitled to the affirmative defense of official immunity. Government employees or officials are entitled to immunity from liability for damages arising from the performance of (1) discretionary duties (2) executed in good faith (3) while acting within the scope of their authority. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994); *Scott v. Britton*, 16 S.W.3d 173, 177 (Tex. App.-Houston [1st Dist.] 2000, no pet.).

■ Official immunity is a common law defense that protects government officers from personal liability for the good-faith performance of discretionary duties within the scope of their authority. *Chambers*, 883 S.W.2d at 653–54. The purpose of official immunity was explained by the supreme court in *Kassen v. Hatley:*

> The purpose of official immunity is to insulate the functioning of government from the harassment of litigation, not to protect erring officials. The public would suffer if government officers, who must exercise judgment and discretion in their jobs, were subject to civil lawsuits that second-guessed their decisions. Official immunity increases the efficiency of employees because they need not spend time defending frivolous charges.

887 S.W.2d 4, 8 (Tex.1994) (citations omitted). Thus, the articulated basis for such immunity is the importance of avoiding distraction of officials from their governmental duties, the desire to avoid inhibition of discretionary actions, minimizing deterrence of able people from public service, avoiding the cost of an unnecessary trial, and insulating officials from burdensome discovery. *Travis v. City of Mesquite*, 830 S.W.2d 94, 102 n. 4 (Cornyn, J., concurring).

#### a. Proprietary versus Governmental Functions

Before determining whether Greanias proved each element of official immunity as a matter of law, we first address Perry's contention that Greanias's claim of official immunity fails because the city engaged in a "proprietary" function, as opposed to a "governmental" function, when it, through Greanias, audited the MCI contract and withheld payment based on the audit's findings.[4] Greanias responds that whether

---

**4.** Perry also contends that the city was engaging in a proprietary, rather than a governmental function, when it entered into the contract with MCI to collect delinquent fines.

such activity was a proprietary or a governmental function is inapposite to whether he is entitled to official immunity. Greanias asserts that, while a municipality is entitled to sovereign immunity related to the performance of its governmental functions, but not its proprietary functions, such a distinction is not germane to a determination of whether a government employee is entitled to official immunity. Because we conclude that Greanias's conduct of engaging in the audit and acting on its findings is inherently governmental, we leave for another day the question of whether a municipal official engaged in a discretionary activity in the course of performing a proprietary function is entitled to official immunity.

■ Perry argues that conducting the audit was a proprietary function because no state statute requires that Greanias perform the audit. The Texas Legislature has defined "governmental functions" as those which are "enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." TEX. CIV. PRAC. & REM.CODE ANN. § 101.0215(a) (Vernon Supp.2002). A proprietary function is one performed by a city, in its discretion, primarily for the benefit of those within the corporate limits of the municipality rather than for use by the general public. *Bailey v. City of Austin,* 972 S.W.2d 180, 193 (Tex.App.-Austin 1998, pet. denied) (citing *City of Gladewater v. Pike,* 727 S.W.2d 514, 519 (Tex.1987)).

■ Here, the Houston City Charter prescribes that the city controller cannot pay any debt owed by the city "until he has audited and examined the claim and found the same justly and legally due and payable, and that the payment has been legally authorized." HOUSTON, TEX., CITY CHARTER art. VIII, § 3 (Act of 1905; added by amend. Oct. 15, 1913). Perry contends that because Greanias's authority for performing the audit arises from the Houston City Charter, as opposed to a state statute, it is not a "governmental function," as defined by the legislature. However, there is no indication that the legislature's definition in subsection 101.0215(a) is the *exclusive* definition of a governmental function. Texas courts have defined "governmental functions" as those "public acts which the municipality performs 'as the agent of the State in furtherance of general law for the interest of the public at large.'" *Bailey,* 972 S.W.2d at 193 (citing *Gates v. City of Dallas,* 704 S.W.2d 737, 738 (Tex.1986) (quoting *City of Crystal City v. Crystal City Country Club,* 486 S.W.2d 887, 889 (Tex.Civ.App.-Beaumont 1972, writ ref'd n.r.e.))). As one court stated: "[T]he key difference between governmental and proprietary functions—both of which are performed by municipalities for the benefit of their citizens—is this: Governmental functions are what a municipality *must* do for its citizens and proprietary functions are what a municipality *may, in its discretion, perform* for its inhabitants." *Oldfield v. City of Houston,* 15 S.W.3d 219, 226 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (emphasis in original). Applying this definition, we conclude that Greanias's audit of the MCI contract was a "governmental function."

■ Home-rule cities, such as Houston, derive their powers not from the legisla-

Perry asserts the collection of overdue fines is not a governmental function. Regardless of whether such conduct is proprietary or governmental, Perry's claims against Greanias focus on Greanias's conduct of auditing the contract and acting on the audit's findings, not the act of collecting overdue fines.

ture, but from the Texas Constitution. *See* TEX. CONST. art. XI, § 5 (authorizing cities having more than five thousand inhabitants to adopt home rule charter); *see also Proctor v. Andrews,* 972 S.W.2d 729, 733 (Tex.1998). A home-rule city possess the full power of self-government. *See Dallas Merchant's and Concessionaire's Ass'n v. City of Dallas,* 852 S.W.2d 489, 490–91 (Tex.1993); *see also* TEX. LOC. GOV'T CODE § 51.072 (Vernon 1999) (providing home rule cities have power of local self-government). A home-rule city's charter is its organic act; it is the fundamental law of the municipality just as a constitution is the fundamental law of a state. *See Anderson v. City of San Antonio,* 123 Tex. 163, 67 S.W.2d 1036, 1037 (1934); *Texas River Barges v. City of San Antonio,* 21 S.W.3d 347, 354 (Tex.App.-San Antonio 2000, pet. denied).

The right to manage fiscal affairs is a defining characteristic of self-government. *See* TEX. LOC. GOV'T CODE ANN. § 101.022 (Vernon 1999) (stating home-rule municipality may control and manage its finances). Like the power of taxation, the power to manage fiscal affairs " 'is an essential and inherent attribute of sovereignty belonging as a matter of right to every independent government.' " *City of San Angelo v. Deutsch,* 126 Tex. 532, 91 S.W.2d 308, 309 (1936) (quoting COOLEY'S, THE LAW OF TAXATION (4TH ED.) vol. 1, § 57). Without such ability, a home-rule city such as Houston would be unable to provide the essential services it owes its citizens. As part of its fiscal responsibility, the city owes a duty to its inhabitants to prevent waste of public funds, which are held in trust for the accomplishment of certain municipal purposes. Thus, the city's duty to manage its fiscal affairs necessarily includes a pre-payment audit of expenditures. Based on these principles, we conclude that Greanias's conduct related to the audit of the MCI contract was a governmental function.

We turn next to whether Greanias established the necessary elements of official immunity.

**b. Discretionary Duty**

■■■ To ascertain whether Greanias is entitled to official immunity, this Court must determine if the conduct in question is discretionary or ministerial. An official is not entitled to immunity when he performs a ministerial duty. *Kassen,* 887 S.W.2d at 9; *Scott,* 16 S.W.3d at 177. If an act involves personal deliberation, decision, and judgment, it is discretionary; actions that require obedience to orders, or the performance of a duty to which the actor has no choice, are ministerial. *Chambers,* 883 S.W.2d at 654; *City of Columbus v. Barnstone,* 921 S.W.2d 268, 272 (Tex.App.-Houston [1st Dist.] 1995, no writ).

■■■ Greanias's summary judgment evidence included his affidavit, a copy of the City of Houston Charter, the audit, and the MCI contract. In his affidavit, Greanias provided the following description of the audit process:

> The Controller's Office exercised significant discretion in its management of desk and field audits.... Among the issues within the judgment and discretion of the Controller's Office with regard to audits were the criteria for which audits would be performed, the determination of what was required to meet professional standards for public sector audits, and the priority to be given to various audit issues. Management of audits also involved hearing and ascertaining facts, as when the Controller's Office would review and perhaps question documentation submitted in support of a payment request. Binding orders and judgments were also part of

the audit process, as when the Controller's Office would determine that it would not pay on a specific invoice.... The audit program from time to time also required the taking of written and oral evidence, such as information about operation of a particular contract

. . . .

The Controller's Office during my tenure conducted field audits in compliance with Generally Accepted Auditing Standards ("GAAS") and Generally Accepted Governmental Auditing Standards ("GAGAS"). Among the requirements of GAAS and GAGAS was that the audit be published. This requirement was also effectively imposed on the Controller's Office by the Texas Open Records Act. During my eight years as Controller, the standard practice was to publish audit findings. Lesser audit findings were communicated by the Controller's Office to management through a separate document. Field audits were primarily the responsibility of the Internal Audit Division of the Controller's Office. In a field audit, the Controller's Office auditors went to the source of the documentation being provided in support of a request for payment. For example, the auditors would go on site to the original records and staff of a department managing a contract for which the Controller's Office was receiving requests for payments. Among the different types of field audits was the contract compliance audit, in which the auditors reviewed a contract into which the City had entered to determine whether the City was assuring compliance with its terms and conditions.

. . . .

In the fall of 1994, the Controller's Office determined that it would conduct a contract compliance audit of the management by [MCAD] of the contract for the collection of delinquent tickets between the City and [MCI] in which the City had named [BCE] a participant.... The decision to conduct the Audit was made by the Controller's Office based on its judgment and discretion.

In conducting the Audit, the Controller's Office regularly and repeatedly exercised its judgment and discretion, heard and determined or ascertained facts on which the Office based its decisions, made binding orders and judgments, affected the personal or property rights of private persons, examined written and oral evidence, and enforced its decisions or imposed penalties. The context for this process was set by the Charter, as well as by the professional audit standards established through GAAS and GAGAS.

For example, the Controller's Office exercised discretion as to the scope of the Audit. Although questions had been raised about why the City had awarded MCI the Contract, and although questions would later arise about BCE, the Controller's Office chose to limit the scope of the Audit to a contract compliance review testing whether MCAD had enforced the Contract in accordance with its term and conditions. Likewise, the Controller's Office later exercised judgment and discretion in determining that, since BCE had not presented competent evidence of work done in exchange [for] City funds received, compliance with GAAS and GAGAS required that the Controller's Office publish an investigative review rather than an audit report. The Controller's Office also exercised judgment and discretion in determining the range of materials reviewed in the course of the Audit in affording MCAD, MCI, BCE, and others significant opportunities to provide information, and in evaluating that information.

During the course of the Audit, the Controller's Office also exercised its authority to hear and determine or ascertain facts, and make decisions based on those facts. As noted above, a range of individuals and entities were given the opportunity to provide written and oral evidence to be considered by the auditors in the process. A number of individuals were afforded the opportunity to provide testimony about the Contract and its operations. Some of this information was actually included in the Audit in the form of written responses from MCAD and Legal Department. The Controller's Office, however, made the final decisions as to the weight to be given to that information, and the effect that information would have on the Audit.

. . . .

The Controller's Office had the authority pursuant to the Charter to enforce its decisions, and to impose penalties, both of which were exercised with respect to the Audit, or in the subsequent responses of the Controller's Office to the Audit findings. The Controller's Office made the decision to conduct the Audit, and did so. The Controller's Office made the decision to include BCE in the work on the Audit, and did so. The Controller's Office determined that, in the absence of competent documentary evidence, the Charter required that the Controller's Office withhold further payments that would go to BCE. The Controller's Office determined the final contents of the Audit, after evaluating the testimony of all those who provided information, as well as all of the documents made available, and after applying the appropriate testing and evaluation techniques that were, in the opinion of the Controller's Office, required by the professional standards established by GAAS and GAGAS. The Controller's

Office also made the decision, in September 1995, and based on the Audit findings, to offset certain amounts owed by MCI against certain amounts owed by the City to MCI.

Consistent with Greanias's statements in the affidavit, the published audit indicated that its scope "consisted principally of inquiries of MCAD and MCI personnel, testing of MCI's records, and analytical review."

Although the city charter mandated that Greanias not pay any debt owed by the city "until he has audited and examined the claim and found the same justly and legally due and payable, and that the payment has been legally authorized," the charter does not specify the manner or method for conducting such audits. HOUSTON, TEX., CITY CHARTER art. VIII, § 3. Thus, the method and manner in which the Controller's Office conducted the MCI audit was determined by Greanias, as stated in his affidavit. *See Guerrero v. Tarrant County Mortician Servs. Co.*, 977 S.W.2d 829, 833 (Tex.App.-Fort Worth 1998, pet. denied) (finding that mortician service hired by medical examiner engaged in discretionary act even though medical examiner had duty to pick up dead bodies because statute relating to picking up of bodies is completely silent regarding manner and method by which medical examiner takes charge of body).

We find that the summary judgment evidence established that Greanias used personal deliberation, decision, and judgment to (1) determine the type of audit to conduct, (2) the extent and manner of investigation, (3) determine what data to review, (4) analyze the data collected, (4) prepare the findings and conclusions of the audit based on the analysis, and (5) withhold BCE's share and offset monies owed to MCI. Thus, Greanias's

conduct relating to the audit, on which Perry bases his complaints, was discretionary as defined in *Kassen.*[5] *See* 887 S.W.2d at 9.

### c. Good Faith

■ This Court must measure good faith in official immunity cases against a standard of objective reasonableness, without regard to the official's subjective state of mind. *Chambers,* 883 S.W.2d at 656; *Scott,* 16 S.W.3d at 179. To be entitled to summary judgment, an official must prove that a reasonably prudent official might have believed that the action taken was appropriate. *Wadewitz v. Montgomery,* 951 S.W.2d 464, 467 (Tex.1997); *Chambers,* 883 S.W.2d at 656–57; *Scott,* 16 S.W.3d at 179. The official need not prove that it would have been unreasonable to take different action, nor that all reasonably prudent officials would have acted as he did. *Wadewitz,* 951 S.W.2d at 467; *Chambers,* 883 S.W.2d at 656–57; *Scott,* 16 S.W.3d at 179.

■ Greanias produced summary judgment evidence demonstrating that his actions in conducting the audit and acting on its findings were objectively reasonable. In particular, Greanias's affidavit stated that (1) Greanias was not only authorized, but obligated under the city charter, to perform the audit; (2) Greanias utilized generally accepted accounting practices in conducting and publishing the audit; and (3) "a range of individuals and entities were given the opportunity to provide written and oral evidence to be considered by the auditors." Additionally, the sum-

mary judgment evidence showed that (1) the city charter forbade Greanias from paying any debt that he determined was not legally owed by the city, and (2) the MCI contract expressly contemplated and gave Greanias the right to conduct the audit.

■ To controvert the official's summary judgment proof on good faith, the plaintiff must show that "no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts." *Chambers,* 883 S.W.2d at 657 (citation omitted). Perry alleged in his response, and stated in his affidavit offered in support of the response, that Greanias did not act in good faith because the audit was a sham to show wrongdoing by Perry and was motivated by Greanias's personal animus toward Perry and Mayor Lanier. However, affidavits consisting of nothing more than conclusions or expressions of subjective belief are not competent summary judgment proof. *Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984). Moreover, the audit does not mention or identify Perry or any wrongdoing by him individually.

■ Perry also contends that Greanias did not act in good faith in withholding BCE's 19% share from the contingency fee payments. However, a corporate stockholder cannot recover damages personally for wrong done solely to the corporation. *Wingate v. Hajdik,* 795 S.W.2d 717, 719 (Tex.1990). As such, Perry's allegation that Greanias was not entitled to withhold payment of BCE's share from

**5.** On appeal, Perry complains that certain statements in Greanias's affidavit are conclusory. Greanias responds that Perry has waived this objection on appeal because he did not raise it in the trial court. A conclusory statement in an affidavit has been held to be a defect in substance rather than a defect in form and is, therefore, not waivable. *See*

*Progressive County Mut. Ins. Co. v. Carway,* 951 S.W.2d 108, 117 (Tex.App.-Houston [14th Dist.] 1997, writ denied). We agree that Greanias's statements that certain conduct was based on his "judgment and discretion" is conclusory. However, in determining whether the conduct at issue was discretionary we do not rely on these statements.

MCI cannot form the basis of Perry's individual claims under state law for slander, defamation, intentional infliction of emotional distress, or violations of his due process and free speech rights under the Texas Constitution. We conclude that Greanias has shown that he acted in good faith in conducting the audit and acting on its findings.

### d. Scope of Authority

 Officials must act within the scope of their authority in order to qualify for official immunity. *Chambers*, 883 S.W.2d at 658. An official acts within the scope of his authority if he is discharging the duties generally assigned to him. *Id.*

 Article VIII of the city charter defines the scope of the city controller's duties: "It shall be the duty of the controller to superintend and supervise the fiscal affairs of the City of Houston, and manage and conduct the same as prescribed by this Charter and the ordinances of the City of Houston that are now or may be hereafter enacted...." HOUSTON, TEX., CITY CHARTER art. VIII, § 2 (Act of 1905; added by amend. Oct. 15, 1913; amended August 14, 1982).

With regard to the specific duties of the controller, the city charter provides as follows:

> He shall, whenever deemed necessary, require all accounts presented to him for settlement or payment to be certified to by affidavit, and he is hereby authorized to administer oaths, with authority to compel and require persons to answer such questions as may be propounded to them touching the correctness of any account or claim against the city. He shall require all persons who shall have received any moneys belonging to the city, and not having accounted therefor, to settle their accounts, and it is hereby made his duty from time to time to require all persons receiving moneys, or having the disposition or management of any property of the city of which an account is kept in his office, to render statements thereof to him....

> No disbursing officer of the city, nor any one having money in his possession for the account of the city, shall pay the same to any person or persons for the account of the city, except to the regularly designated officer or custodian of the public funds for the city, except upon draft or warrant countersigned by the controller of the City of Houston, and all signed by the mayor; and the controller shall not countersign any such draft or warrant until he has audited and examined the claim and found the same justly and legally due and payable, and that the payment has been legally authorized, and appropriation therefor duly made, and that the appropriation has not been exhausted.

*Id.* at art. VIII, § 3 (Act of 1905).

In his affidavit, Greanias also describes what his duties were when he was city controller:

> Pursuant to the requirements of the Charter, as amplified upon by ordinance, the Controller's office during my tenure issued annual, monthly, and interim financial reports, determined accounting policies and practices for the City, processed all requests for payment and issued all checks, managed the City's cash portfolio, and took a lead responsibility in the City's debt program.

> ....

> The decisions of the Controller's Office could, and from time to time did, affect the personal or property rights of private persons.... [T]he Controller's Office could withhold a check from a proposed payee, or decide to offset against a check to that payee. Withholding involved the Controller's Office

suspending a payment pending further information in support of the expenditure. Offset occurred when the Controller's Office reduced the amount paid to a payee by whatever amounts the payee owed the City. Withholding and offset were both based on the Charter-mandated responsibilities of the Controller's Office, which are found in Article VIII, Section 3, of the Charter.

The Controller's Office was also engaged daily in enforcing its decisions, imposing penalties, or both. Questions of accounting policy and practice could be both large and small; the issue for the Controller's Office might be the policy and practice, or it might be the application of the policy or practice. Either way, the question required the Controller's Office to make a decision. . . .

The Charter also requires the Controller to conduct audits on requests for payments from the City. . . . To fulfill this responsibility, the Controller's Office practice was to perform a desk audit on virtually, if not all requests for payment. . . .

. . . .

The Controller's Office during my tenure conducted field audits. . . . Field audits were primarily the responsibility of the Internal Audit Division of the Controller's Office. . . . Among the different types of field audits was the contract compliance audit, in which the auditors reviewed a contract into which the City had entered to determine whether the City was assuring compliance with its terms and conditions.

During my eight years as Controller, the Controller's Office performed at least 300 audits. . . . A number of them involved withholding or offsets. . . .

Based on the language of the city charter, and, as described in Greanias's affidavit, Greanias acted within the scope of his authority when he conducted the MCI audit and acted on its findings.

 We hold that Greanias was immune from liability in connection with Perry's claims for violations of his due process and free speech rights under the Texas Constitution, and is immune from liability in connection with Perry's claims for slander, defamation, and intentional infliction of emotional distress that are premised on Greanias's actions and statements related to conducting the audit and acting on its findings.

2. *Qualified Immunity For Section 1983 Claims*

Perry has brought claims against Greanias under 42 U.S.C. section 1983 for violations of his federal constitutional First Amendment right of free speech and Fourteenth Amendment right of due process. Greanias asserts he is entitled to qualified immunity on these claims.

 Qualified immunity is an immunity from liability available to government officials sued in their individual capacities under section 1983. *Scott,* 16 S.W.3d at 180; *Haynes v. City of Beaumont,* 35 S.W.3d 166, 175 (Tex.App.-Texarkana 2000, no pet.). Government officials performing discretionary functions have qualified immunity from liability for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 1699, 143 L.Ed.2d 818 (1999); *Scott,* 16 S.W.3d at 180.

 In the case of a qualified immunity defense to a section 1983 claim, once the defendant official pleads good faith and demonstrates that his actions occurred in the context of his discretionary authority, the burden shifts to the plaintiff to rebut this defense by establishing that

the official's allegedly wrongful conduct violated clearly established law. *Thomas v. Collins,* 860 S.W.2d 500, 503 (Tex.App.-Houston [1st Dist.] 1993, writ denied); *Carrera v. Yepez,* 6 S.W.3d 654, 661 (Tex. App.-El Paso 1999, pet. dism'd w.o.j.). The plaintiff must show that (1) the official's conduct violated a federally guaranteed right, (2) the right was clearly established, and (3) the official's conduct was objectively unreasonable in light of the clearly established right. *Thomas,* 860 S.W.2d at 503; *Haynes,* 35 S.W.3d at 176. Here, Greanias asserted qualified immunity in his motion for summary judgment, and it is undisputed that he was a government official.

■ As discussed above, the summary judgment evidence showed that Greanias's actions of conducting the audit and acting on its findings involved the exercise of discretion. As such, the burden then shifted to Perry to rebut Greanias's qualified immunity defense relating to his section 1983 claims based on those allegations. In this case, Perry failed to present any responsive argument that (1) Greanias's conduct violated his federally guaranteed rights, (2) the rights were clearly established, and (3) Greanias's conduct was objectively unreasonable in light of the clearly established rights. Therefore, the trial court properly granted summary judgment on Perry's federal constitutional claims brought under section 1983. *See Haynes,* 35 S.W.3d at 176 (holding that trial court was authorized to grant summary judgment on section 1983 claims because plaintiff failed to respond to motion for sum-

mary judgment and did not meet burden to rebut qualified immunity defense).

## B. Greanias's Post–Audit Statements

■ We now turn to the other factual allegations that form the basis of Perry's claims for libel, slander, and intentional infliction of emotional distress, i.e., Greanias's alleged public statements that the contract was awarded to MCI as a political favor from Mayor Lanier to Perry, and Greanias's alleged statements to the media that the matter had been referred to the FBI for investigation. Although these allegations were clearly stated in Perry's Second Amended Petition, which was the live pleading at the time the trial court granted summary judgement, Greanias failed to offer any arguments or summary judgment evidence establishing that his defensive theories precluded either liability or suit based on these allegations. Instead, Greanias limited his arguments to Perry's allegations relating to Greanias's actions and statements involved in the audit.[6]

A motion for summary judgment must stand or fall on the grounds expressly presented in the motion. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996); *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993). We are restricted to reviewing the propriety of the granting of the summary judgment on the basis of the grounds actually asserted in the motion for summary judgment. *Cates,* 927 S.W.2d at 626; *Home Indem. Co. v. Pate,* 814 S.W.2d 497, 500 (Tex.App.-Houston [1st Dist.] 1991, writ

---

**6.** At oral argument, Greanias argued that the post-audit statements were made within the context of the audit, or were related to the audit. However, this assertion was not made in Greanias's motion for summary judgment. To the contrary, Greanias's affidavit offered in support of the summary judgment states, "Issues such as how the City had selected MCI

were not included" in the audit. We cannot consider grounds for summary judgment not asserted in the motion for summary judgment. *See McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993); *Chessher v. Southwestern Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983).

denied). A trial court errs in granting more relief than was requested by disposing of issues never presented to it in the motion for summary judgment. *See Mafrige v. Ross*, 866 S.W.2d 590, 592 (Tex. 1993), *overruled on other grounds, Lehmann v. Har-Con Corp.*, 39 S.W.3d 191 (Tex.2001). It is reversible error to grant a motion for summary judgment on a cause of action not addressed in the motion for summary judgment. *Chessher v. Southwestern Bell Tel. Co.*, 658 S.W.2d 563, 564 (Tex.1983); *Smith v. Atlantic Richfield Co.*, 927 S.W.2d 85, 88 (Tex.App.-Houston [1st Dist.] 1996, writ denied).

 Perry's allegations that (1) Greanias made public statements that the contract was awarded to MCI as a political favor from Mayor Lanier to Perry and (2) Greanias told the media that the matter had been referred to the FBI for investigation, were not addressed in Greanias's motion. Thus, the trial court granted more relief than requested by Greanias in his motion for summary judgment and erred in rendering summary judgment in favor of Greanias as to Perry's claims for slander, defamation, and intentional infliction of emotional distress to the extent that such causes of action were based on the post-audit statements.[7] *See Farah v.*

*Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 673 (Tex.App.-Houston [1st Dist.] 1996, no writ) (reversing summary judgment in legal malpractice action in which defendants' motion for summary judgment did not address plaintiff's contention that defendants should have asserted particular claim in underlying suit).

We overrule Perry's first issue based on our holding that (1) Greanias is immune from liability in connection with Perry's claims of violations of his due process and free speech rights under the Texas and United States Constitutions, and (2) Greanias is immune from liability in connection with Perry's claims of slander, defamation, and intentional infliction of emotional distress that are based on Greanias's conduct related to the audit; however, we sustain Perry's first issue to the extent that we hold Greanias is not entitled to summary judgment on Perry's claims of libel, slander, and intentional infliction of emotional distress that are based on his allegations relating to Greanias's alleged post-audit statements.

## C. Justification Defense

In issue three, Perry contends that Greanias was not entitled to the affirmative defense of legal justification as stated

---

7. Arguably, the only affirmative defense asserted by Greanias in his motion for summary judgment that could apply to *all* of Perry's allegations is Greanias's claim of "executive privilege." In his motion for summary judgment, Greanias asserted: "Because Perry's claims against Greanias arise from Greanias' actions and statements in his executive capacity as Controller, the doctrine of executive privilege as a matter of law affords Greanias individually an absolute privilege against those claims." Based on the defense of "executive privilege," the court in *Salazar v. Morales* held that the Texas Attorney General had an absolute privilege to publish, *in the performance of his official duties*, material that may be perceived to be defamatory. 900 S.W.2d 929, 934 (Tex.App.-Austin 1995, no writ); *see*

*also* RESTATEMENT (SECOND) OF TORTS § 591(b) (1977) ("An absolute privilege to publish defamatory matter concerning another in communications made in the performance of his official duties exists for ... a governor or other superior executive officer of a state."); *cf. City of Cockrell Hill v. Johnson*, 48 S.W.3d 887, 898 (Tex.App.-Fort Worth 2001, pet. denied) (holding that comments made to press by mayor, aldermen, and city council members regarding dismissal of police chief were absolutely privileged). Here, Greanias offered no argument or summary judgment evidence that he made the alleged statements, regarding the award of the contract and the FBI investigation, in the performance of his official duties.

in *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex.1996), which Greanias raised in his motion for summary judgment, as a defense to Perry's claim for tortious interference with contract. However, as Greanias states in his brief, Perry did not assert a claim for tortious interference with contract against Greanias in his Second Amended Petition. This claim was only asserted by Perry against the City of Houston.

We overrule Perry's issue three. We need not address Perry's issue two relating to Greanias's defense of quasi-judicial privilege, which was raised only in connection with Greanias's conduct related to the audit.

### CONCLUSION

The trial court properly granted summary judgment with respect to Perry's claims for (1) violations of his due process and free speech rights under the Texas Constitution and (2) violations of his First Amendment right to free speech and his Fourteenth Amendment right to due process brought pursuant to 42 U.S.C. section 1983. The trial court also properly granted summary judgment with respect to Perry's claims for (1) slander, (2) defamation, and (3) intentional infliction of emotional distress that are based on Greanias's actions related to conducting the audit and acting on the audit's findings. However, we reverse the trial court's judgment with respect to Perry's claims for (1) slander, (2) defamation, and (3) intentional infliction of emotional distress to the extent they are based on Greanias's alleged statements following the publication of the audit. We remand the cause for further proceedings.