Opinion issued April 13, 2006 



 














In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-05-00217-CV
__________
 
TRAVIS HENDRIX, Appellant
 
V.
 
PORT TERMINAL RAILROAD ASSOCIATION, Appellee
 

 
 
On Appeal from the 165th District Court
Harris County, Texas
Trial Court Cause No. 2003-55644
 

 
 
O P I N I O N
          Appellant, Travis Hendrix, challenges the trial court’s rendition of summary
judgment in favor of appellee, the Port Terminal Railroad Association (“PTRA”), in
Hendrix’s personal injury suit brought under the Federal Employers Liability Act
(“FELA”).


 In his first issue, Hendrix, a railroad switchman, contends that the trial
court erred in granting summary judgment on his claims for his personal injuries that
he sustained while walking on an “unsafe walkway made up of too large and mixed
ballast” on the grounds that such claims are preempted by the Federal Railroad Safety
Act (“FRSA”).


 In his second issue, Hendrix contends that the trial court erred in
granting summary judgment as to his “causes of action and theories of recovery” not
addressed in the PTRA’s summary judgment motion. 
          We reverse the judgment of the trial court and remand for further proceedings
consistent with this opinion. 
Factual and Procedural Background
          In his original petition, Hendrix alleged that he was injured while working as
a switchman for the PTRA, that the PTRA’s negligence caused him injuries, and that
the PTRA negligently: “(1) failed to furnish a reasonably safe walkway on which to
work; (2) furnished big rock ballast in the yard walkways; (3) expected and
encouraged switchmen to regularly get on and off moving cars on big rock ballast in
yard walkways; (4) expected and encouraged switchmen to regularly throw hard to
throw switches on big rock ballast in yard walkways; (5) expected and encouraged
switchmen to regularly hold up defective pin lift levers on big rock yard ballast; (6)
expected and encouraged switchmen to regularly adjust hard to align draw bars on big
rock yard ballast; (7) failed to furnish a safe place to work; and (8) failed to furnish
safe equipment with which to work.” 
          The PTRA filed a summary judgment motion, contending that Hendrix’s
“FELA allegations of improper ballast are preempted by the [FRSA].” The PTRA
asserted that “the Federal Railroad Administration (“FRA”), under the authority of
the FRSA, has promulgated regulations specifically addressing ballast” and that,
“since the FRSA has specifically regulated track safety and track standards, including
ballast, its regulations have occupied the subject matter of Hendrix’s allegations,”
and, thus, Hendrix’s FELA claims are preempted. In the closing of its motion, the
PTRA reiterated its specific contention that Hendrix’s “ballast claims concerning the
nature and size of the ballast” are preempted and that, since this allegation “is the sole
basis of Hendrix’s suit,” the PTRA was entitled to summary judgment on Hendrix’s
suit. 
          The PTRA attached a copy of a signed statement made by Hendrix in an
incident report in which Hendrix stated that he was walking between tracks 40 and
41 of the rail yard for the purpose of “coupling cars,” that he “did not notice any
obstructions or uneven ballast which [he] was walking on,” and that as he “continued
walking northward between the two tracks” at “approximately half way down into the
track [he] felt a sharp pain in [his] left ankle.” Hendrix further stated that he did not
“trip over anything in the toe path” and “did not notice anything unusual other than
there was large ballast rocks as well as small fine walkway material along the tow
path.” The PTRA also attached a copy of Hendrix’s deposition, in which Hendrix
testified that he “stepped on some big rocks and they kind of shifted underneath [his]
feet and [his] ankle gave way” and that he felt a sharp pain in his ankle. Hendrix
further testified, somewhat in contradiction to his statement, that the presence of large
ballast in the rail yards was not unusual, that the large ballast was “everywhere” in
the yard, and that there was no small fine walkway material.  
          Hendrix filed a response to the PTRA’s summary judgment motion, asserting
that his claims are not “preempted.” Hendrix argued that while certain federal
regulations prescribed minimum safety requirements for ballast, such requirements
related only to “track structure and drainage” and did not relate to the size of ballast
or the safety of walkway conditions. Hendrix attached to his response a copy of the
deposition testimony of Edward Blysard, another PTRA switchman, who testified
that he had made complaints to PTRA officials about the size of the ballast in the area
of tracks 40 and 41 prior to Hendrix being injured. Blysard also stated that, in his
opinion, the rocks between tracks 40 and 41 were unsafe, dangerous, created a
walking hazard, and should have been removed. Hendrix also attached to his
response the deposition testimony of Charles Anderson, a PTRA engineer, who
testified that he had heard complaints about the size of the ballast in the walkways
and that, in response to these complaints, the PTRA had brought in some smaller
ballast to “smooth things out.” 
          Finally, Hendrix attached to his response the deposition testimony of Darrell
Himel, a PTRA supervisor with “responsibility for the track, the roadbed, the ballast,
and the infrastructure,” who testified that he had frequently visited the yard in
response to complaints made by PTRA employees concerning the walkway
conditions. Employees had complained that the ballast was too big and was
inconsistent, that the walkways were not level, and that the ballast would shift under
their feet. Himel conceded that the relevant federal regulations did not address the
size, type, or make up of ballast, that the regulations did not provide ballast standards
for providing safe, secure, and level footing, and that such issues were left to the
railroads. Himel further stated that the PTRA tries to follow various standards or
recommendations concerning the size and type of ballast used in a rail yard. For
example, the PTRA consults a manual published by the American Railway
Engineering Association, which includes a section on ballast, and tries to follow the
standards set forth therein, not only for track drainage and structural issues but also
for safety.
           After the PTRA filed its summary judgment motion, Hendrix filed a third
amended petition, and ultimately a fourth amended petition. In his third amended
petition, Hendrix repeated his initial allegations and made more specific allegations
concerning the PTRA’s alleged negligence in regard to the size of the ballast in the
rail yard walkway. Specifically, Hendrix asserted that the PTRA “placed too big a
rock ballast in the yard walkways,” mixed small rock ballast with larger rock ballast,
failed to properly smooth over and properly pack down the ballast rocks after
complaints were made, failed to properly maintain and inspect the yard walkways and
repair and replace the big rocks in the yard walkways, and failed “to provide level
yard walkway ballast conditions.” Furthermore, Hendrix added allegations that the
PTRA was negligent in pressuring switching crews to work faster, reducing crew
sizes, overworking crew members, sending Hendrix back to work with a weak ankle,
abandoning certain safety rules, failing to hire a sufficient number of switchmen, and
failing to provide Hendrix with the necessary equipment in order to perform his job. 
Hendrix also added an allegation that the PTRA’s conduct caused him “repeated
ongoing trauma.” The PTRA did not file an amended summary judgment motion
addressing any new claims or theories raised by Hendrix’s third amended petition.



          The trial court granted the PTRA’s summary judgment motion and stated in its
order that the “judgment is final, disposes of all claims and all parties, and can be
appealed.”
Standard of Review
          To prevail on a summary judgment motion, a movant has the burden of proving
that it is entitled to judgment as a matter of law and that there is no genuine issue of
material fact. Tex. R. Civ. P. 166a(c); Cathey v. Booth, 900 S.W.2d 339, 341 (Tex.
1995). We may affirm a summary judgment only when the record shows that a
movant has disproved at least one element of each of the plaintiff’s claims or has
established all of the elements of an affirmative defense as to each claim. Am.
Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997). We must accept as true
evidence in favor of the nonmovant and indulge every reasonable inference and
resolve all doubts in favor of the nonmovant. Cathey, 900 S.W.2d at 341.
          When, as in this case, a defendant moves for summary judgment based partially
on its own affirmative defense, the defendant has the burden of proving each element
of its defense as a matter of law. See Montgomery v. Kennedy, 669 S.W.2d 309,
310–11 (Tex. 1984) (affirmative defenses of fraud and estoppel); see also Kiefer v.
Continental Airlines, Inc., 882 S.W.2d 496, 498 (Tex. App.—Houston [1st Dist.]
1994), aff’d, 920 S.W.2d 274 (Tex. 1996) (affirmative defense of preemption).
Preclusion
          In his first issue, Hendrix contends that his claims for personal injuries that he
sustained while walking on an “unsafe walkway made up of too large and mixed
ballast” are not preempted by the FRSA. Hendrix notes that the only federal
regulations related to ballast specify that “the ballast must provide proper track
support and alignment and proper drainage” and that there are no regulations
concerning the size, type, or mixture of ballast used in various areas of the track,
walkways, and work areas of switchmen. In sum, Hendrix asserts that the federal
regulations concerning ballast “deal with the safety of the track, not the safety of
employees working in and around tracks” and that he “was not injured because of a
track structure that was not properly supported by ballast or because the ballast did
not provide proper drainage,” but rather because of unsafe walkway conditions and
“bad footing.” He further notes that he is not attempting to enforce a tort duty “in
contradiction of the ballast provisions” of the federal regulations.
          The PTRA contends that the FRA, under the authority of the FRSA, has
promulgated regulations specifically addressing ballast and that those regulations
“occupied the field with regard to the subject matter of the regulation and of rail
safety, precluding other regulations, common law tort remedies, and specifically
allegations in a FELA suit regarding the same subject matter.” The PTRA contends
that “to allow a FELA plaintiff to claim that the track roadbed and walkway must be
of a certain character and quality beyond that required by the regulations would
invalidate” the regulations promulgated under the FRSA. Citing Missouri Pacific
Railroad Co. v. Railroad Commission of Texas, 948 F.2d 179 (5th Cir. 1991)
(“Mopac II”), and Missouri Pacific Railroad Co. v. Railroad Commission of Texas,
833 F.2d 570 (5th Cir. 1987) (“Mopac I”), the PTRA further asserts that the United
States Court of Appeals for the Fifth Circuit has previously held that similar claims
concerning rail yard ballast and walkway conditions are preempted.
          FELA, which was enacted by Congress with the purpose of reducing injuries
and deaths resulting from accidents on interstate railroads, is a broad remedial statute
that is to be construed liberally in order to effectuate its purposes. Consol. Rail Corp.
v. Gottshall, 512 U.S. 532, 543, 114 S. Ct. 2396, 2404 (1994). FELA “provides the
exclusive remedy for a railroad employee injured as a result of his employer’s
negligence.” Lane v. R.A. Sims, Jr., Inc., 241 F.3d 439, 442 (5th Cir. 2001). FELA
mandates that railroads operating in interstate commerce
shall be liable in damages to any person suffering injury while he is
employed by such carrier in such commerce . . . for such injury or death
resulting in whole or part from the negligence of any of the officers,
agents, or employees of such carrier, or by reason of any defect or
insufficiency, due to its negligence, in its cars, engines, appliances,
machinery, track, roadbed, works, boats, wharves, or other equipment.
 
45 U.S.C. § 51 (2000). 
          FRSA’s stated purpose “is to promote safety in every area of railroad
operations.” 49 U.S.C. § 20101 (2000). In enacting the FRSA, Congress authorized
the Secretary of Transportation to “prescribe regulations and issue orders for every
area of railroad safety.” 49 U.S.C. § 20103(a) (2000). Congress further declared that
“[l]aws, regulations, and orders related to railroad safety shall be nationally uniform
to the extent practicable.” 49 U.S.C. § 20106 (2000). To effectuate the purpose of
national uniformity, the FRSA contains a preemption clause that states, in part:
A State may adopt or continue in force any law, rule, regulation, or
standard relating to railroad safety until such time as the Secretary [of
Transportation] has adopted a rule, regulation, order or standard
covering the subject matter of such State requirement. A State may
adopt or continue in force an additional or more stringent law, rule,
regulation, order, or standard relating to railroad safety when necessary
to eliminate or reduce an essentially local safety hazard, and when not
incompatible with any Federal law, rule, regulation, order, or standard,
and when not creating an undue burden on interstate commerce.
 
Id. “According to [this section], applicable federal regulations may preempt any state
‘law, rule, regulation, order, or standard relating to railroad safety’” and “[l]egal
duties imposed on railroads by the common law fall within the scope of these broad
phrases.” CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 113 S. Ct. 1732, 1737
(1993); see also Fed. Ins. Co. v. Burlington N. & Santa Fe Ry., 270 F. Supp. 2d 1183,
1187 (C.D. Cal. 2003) (“State common law tort claims, such as negligence, fall within
the scope of this pre-emption.”).
          The Secretary of Transportation has promulgated regulations pursuant to its
FRSA authority, including establishing maximum train speeds for certain classes of
railroad tracks. Lane, 241 F.3d at 442. The Supreme Court has held that the FRSA,
and the federal regulations promulgated thereunder, preempt state tort claims in two
areas. Easterwood, 507 U.S. at 676, 113 S. Ct. at 1743–44; Norfolk S. Ry. Co. v.
Shanklin, 529 U.S. 344, 358–59, 120 S. Ct. 1467, 1477 (2000). First, in Easterwood,
the Supreme Court held that the FRSA preempted a state common law tort claim
alleging that a train traveling at excessive speed caused the death of a truck driver. 
507 U.S. at 676, 113 S. Ct. at 1743–44. After noting that, “on their face, the [relevant
regulations] address only the maximum speeds at which trains are permitted to travel”
the Court found that “related safety regulations . . . reveal that the limits were adopted
only after the hazards posed by track conditions were taken into account,” and, thus,
“the speed limits must be read as not only establishing a ceiling, but also precluding
additional state regulation of the sort that [the plaintiff sought] to impose.” Id. at 674,
113 S. Ct. at 1742. Thus, the Court concluded that the federal regulations preempted
a state common law negligence claim alleging that the train was traveling at an
excessive speed. Id. at 675–76, 113 S. Ct. at 1742– 43. More recently, the Supreme
Court has held that the FRSA, and the relevant regulations promulgated thereunder
concerning warning devices at railroad crossings, preempt state tort claims
concerning a railroad’s failure to maintain adequate warning devices at crossings
when federal funds have been used in installing those devices. Shanklin, 529 U.S. at
358–59, 120 S. Ct. at 1477. In both of these cases, the Supreme Court made clear that
the “language of the FRSA’s preemption provision dictates that, to preempt state law,
the federal regulation must ‘cover’ the same subject matter, and not merely ‘touch
upon’ or ‘relate to’ that subject matter.” Id. at 352, 120 S. Ct. at 1473. The Court has
also noted that “‘covering’ is a more restrictive term, which indicates that preemption
will lie only if the federal regulations substantially subsume the subject matter of the
relevant state law.” Easterwood, 507 U.S. at 664, 113 S. Ct. at 1738. 
          Because this case involves negligence allegations brought by an employee
under FELA, rather than allegations brought by a private citizen under state common
law tort remedies, we are not presented with a “preemption analysis” like that
presented in Easterwood and Shanklin. Rather, we are presented “with the interaction
of two federal statutes.” Waymire v. Norfolk & W. Ry. Co., 218 F.3d 773, 775 (7th
Cir. 2000). Both the United States Court of Appeals for the Seventh Circuit, and,
more recently, the United States Court of Appeals for the Fifth Circuit, have cited the
“preemption” analysis in Easterwood and Shanklin in determining that certain FELA
negligence claims are “precluded” by the FRSA. In Waymire, the Seventh Circuit
extended the Supreme Court’s holding in Easterwood and Shanklin to apply to a
FELA negligence action alleging unsafe train speed and inadequate warning devices
at railroad crossings. 218 F.3d at 775. In that case, a railroad employee brought a
FELA claim against his employer and alleged that his employer was negligent in
allowing a train to travel at an unsafe speed; the employee also alleged that the
railroad used inadequate warning devices. Id. The Waymire court found that “in
order to uphold FRSA’s goal of uniformity [it] must strike the same result” reached
in Easterwood and Shanklin. Id. at 776. Thus, it held that the FELA negligence
claims based upon train speed and inadequate warning devices were superseded by
the FRSA and the regulations promulgated thereunder. Id. at 777. 
          The Fifth Circuit followed suit in Lane, when a railroad employee brought an
“excessive-speed” claim against his employer after the train on which he was working
struck a tractor-trailer at a railroad crossing. 241 F.3d at 441–42. The employee
argued that the FRSA did not preclude his FELA excessive-speed claim and further
asserted that “the FRSA speed regulations are minimum safety requirements” and that
compliance with the minimum requirements does not preclude finding negligence “if
reasonable railroads would have taken additional precautions to prevent injury to
their employees.” Id. at 442. The Fifth Circuit rejected the employee’s argument,
noting that “uniformity can be achieved only if the regulations covering train speed
are applied similarly to a FELA plaintiff’s negligence claim.” Id. at 443.
          Waymire and Lane establish that, at least in some circumstances, a negligence
claim brought under FELA may be precluded by the FRSA and the federal regulations
promulgated thereunder. Thus, the underlying issue before us is whether the FRSA
and regulations promulgated thereunder preclude Hendrix’s FELA claims arising out
of his allegations concerning unsafe walkway conditions and rail yard ballast. 
          The Secretary of Transportation has promulgated regulations pursuant to his
FRSA authority related to ballast, which, in relevant part, provide:
PART 213 TRACK SAFETY STANDARDS
 
§ 213.1 Scope of Part
 
This part prescribes initial minimum safety requirements for railroad
track that is part of the general railroad system of transportation. The
requirements prescribed in this part apply to specific track conditions
existing in isolation. Therefore, a combination of track conditions, none
of which individually amounts to a deviation from the requirements in
this part, may require remedial action to provide for safe operations over
that track.
 
. . . .
 
Subpart D-Track Structure
 
§ 213.101 Scope.
 
This subpart prescribes minimum requirements for ballast, crossties,
track assembly fittings, and the physical conditions of rails.
 
§ 213.103 Ballast; general.
 
Unless it is otherwise structurally supported, all track shall be supported
by material which will-
 
(a)     Transmit and distribute the load of the track and
railroad rolling equipment to the subgrade;
 
(b)     Restrain the track laterally, longitudinally, and
vertically under dynamic loads imposed by railroad
rolling equipment and thermal stress exerted by the
rails;
 
(c)     Provide adequate drainage for the track; and
 
(d)     Maintain proper track cross-level, surface and
alinement [sic].
 
49 C.F.R. §§ 213.1, 213.101, 213.103.
          As noted by Hendrix, these regulations relate to track structure and drainage,
and the size and type of ballast are not specifically covered in the regulations. In
support of his contention that his ballast claims are not precluded, Hendrix cites to
Grimes v. Norfolk Southern Railway Co., 116 F. Supp. 2d 995, 998 (N.D. Ind. 2000);
CSX Transportation, Inc. v. Miller, 858 A.2d 1025, 1039 (Md. Ct. Spec. App. 2004);
and Elston v. Union Pacific, 74 P.3d 478, 488 (Colo. Ct. App. 2003),. In Grimes, a
railroad conductor sustained injuries when he fell into a hole while walking beside
the tracks in order to inspect a train after a vehicular collision. 116 F. Supp. 2d at
998. The conductor alleged that he was forced to walk on the edge of the ballast
because the area directly adjacent to the track was too steep and because there were
“large stones used in the ballast [that] rolled under his feet.” Id. The conductor
claimed that the railroad was negligent in failing to provide a safe walkway for
employees to use when they must walk alongside the train to inspect the cars. Id. at
1000. The railroad sought summary judgment on the ground that its compliance with
the FRSA regulations dealing with track beds and ballast precluded the conductor’s
FELA claims. Id. at 1002. The court, noting that “the regulations are directed toward
creating a safe roadbed for trains, not a safe walkway for railroad employees,” did not
find anything in the regulations that precluded the conductor from asserting that the
railroad was negligent in failing to provide a safe place to walk. Id. at 1002–03. The
court further noted, “There is also nothing in the language or legislative history of any
enactment, including FRSA, that indicates the serious purpose of undermining the
basic core of FELA and its essential purposes.” Id. at 1003. In conclusion, the court
“declined [the railroad’s] invitation” to “preclude a negligence claim under FELA for
any conduct by the railroad even remotely covered by a regulation enacted under
FRSA.” Id. 
          Similarly, in Miller, a railroad employee brought suit for cumulative trauma
occurring over the period of his employment caused by walking on large ballast. 858 
A.2d at 1039. After reviewing the ballast regulations promulgated pursuant to the
FRSA, the Maryland Court of Special Appeals held that these regulations did not
preclude the FELA suit. Id. at 1050. In support of its holding, the court stated
Even a surface glance at the FRSA regulation relied on by CSX
persuades us that it does not touch, let alone pervasively cover, the
railroad yard conditions that allegedly fell short of the safe and healthy
workplace environment that CSX was obligated to provide for its
employees. The regulation is concerned with the track and its
immediately adjoining area and not with railroad yards. The obvious
concern, moreover, is with the safety of the train, the prevention of
derailments, and not the quality of the work place provided for
employees. 
 
Id. 
          Finally, in Elston, a railroad employee alleged that, while walking alongside
the tracks, he slipped and fell on steeply pitched, snow-covered “ballast” and injured
his knee. 74 P.3d at 481. He alleged that the railroad was negligent under FELA for
failing to provide reasonably safe walkways alongside its mainline tracks. Id. The
Colorado Court of Appeals noted that “[u]nlike the issues of excessive speed and
inadequate warning devices that are expressly covered in the FRSA, the issue of
walkways is not explicitly addressed in the federal safety regulations.” Id. at 487. 
The court stated that the regulations cited by the railroads “are directed at promoting
a safe roadbed for trains, but offer no indication whether a railroad has a duty to
provide safe walkways for employees alongside its tracks” and rejected the railroad’s
contention that its compliance with the FRSA’s track safety standards precludes a
finding of negligence under FELA. Id. at 488. And like the court in Grimes, the
Elston court found that “[n]othing in the language of the FRSA conflicts with or
undermines the primary function of FELA.” Id. The court further noted “the purpose
of the FRSA, to promote safety in all areas of railroad operations and reduce railroad
related accidents, . . . is consistent with the goal of FELA, to promote employee safety
and hold railroads liable for injuries caused by their negligence.” Id. 
           The PTRA contends that the above cases are “flatly contradicted” by the Fifth
Circuit’s holdings in Mopac I and Mopact II. In Mopac I, a group of railroads alleged
that proposed railroad safety regulations promulgated by the Texas Railroad
Commission were preempted by regulations promulgated under the FRSA. 833 F.2d
at 572. One of the proposed regulations, section 5.619, required “smooth, maintained
properly sloped walkways which are level with the tops of the ties along both sides
of all tracks within railyards and the tracks adjacent thereto, in an effort to provide
safer working conditions for employees working on or around the tracks.” Id. at 572
n.1.


 The court noted that this proposed regulation “establishes walkway surface,
slope, and width specifications and requires walkways to be constructed along both
sides of all tracks within rail yards.” Id. at 574. The court further noted that the
required walkways would “sit atop and adjoin the roadbed for which FRA has
prescribed minimum specifications” and that federal regulations “govern[ed] roadbed,
track geometry and track structure and specifically cover[ed] areas ‘adjacent to the
roadbed,’ as well as track gauge, alignment, surface, ballast, drainage and component
parts.” Id. While the commission argued that the proposed regulation was not
preempted because federal regulations did not mandate walkways, the court rejected,
as too simplistic, the argument that, in considering the preemption issue, the federal
regulation should be analyzed “in terms of its precise safety concerns.” Id. The Fifth
Circuit stated that “assuming walkways are integrally related to track structure and
composition,” it would be impracticable and inconsistent with the FRSA’s intent to
establish national rail safety standards if “50 states could establish individual
walkway regulations in addition to the FRA standards.” Id. While the court
ultimately held that “there [was] a material fact issue concerning the interrelationship
between the state walkway requirement and federal track regulations,” and remanded
the issue to the district court for a trial, it provided the district court with the
following guidance:
          It likewise appears in this case that the Commission may seek to
enforce ‘different or higher standards’ of track construction by
superimposing the walkway requirement on federal track geometry and
structure regulations. This would be the case if, from a practical
standpoint, the width, surface and slope requirements of the state
walkway regulation generally add to the FRA standards by requiring the
railroad to strengthen or enlarge the roadbed beyond FRA requirements.
 
Id. at 574–75.


 
          On remand the district court, after considering expert testimony from both
sides, found that “the roadbed would in fact have to be enlarged laterally and
strengthened in order to support the walkway” and that the “body of material used to
support the walkway would have to adjoin the roadbed in such a way that it would be
integrated with it,” and, thus, held that the proposed state regulation was preempted. 
Mopac II, 948 F.2d at 183. The Fifth Circuit, this time limiting its review of the
district court’s factual findings for clear error, held that, while both sides presented
“convincing evidence,” it could not reverse the lower court’s finding when “there
[were] two or more permissible views of the record evidence.” Id. at 184. The court
concluded, “the state provisions would still require the railroads to enlarge and
strengthen existing roadbeds to accommodate the walkways–which is enough to
support a finding of preemption.” Id. 
          The PTRA, in support of its preclusion argument, also cites to Norfolk &
Western Railway Co. v. Public Utilities Commission of Ohio, 926 F.2d 567 (6th Cir.
1991); Black v. Seaboard System Railroad, 487 N.E.2d 468 (Ind. Ct. App. 1986); and
Black v. Baltimore & Ohio Railroad Co., 398 N.E.2d 1361 (Ind. Ct. App. 1980). In
Norfolk & Western Railway Co., the United States Court of Appeals for the Sixth
Circuit held that FRA regulations preempted a state regulation requiring railroads to
provide walkways and railings for trainmen along the side of railroad bridges. 926
F.2d at 571. The court noted that the FRA had previously directly addressed the issue
of railroad bridge walkways and decided that a general bridge walkway requirement
was not necessary because such a rule “would impose significant added burdens in
terms of the large dollar cost to the railroad industry for construction of the walkways,
the added hazard to persons and property and additional liability exposure for the
railroads because of increased trespassing, and the possible decrease in overall
railroad safety because of the diversion of resources from other maintenance and
improvement projects.” Id. at 570–71 (quoting 42 Fed. Reg. 22185 (May 2, 1977)).


 
 Thus, the FRA affirmatively determined that issuance of federal regulations requiring
walkways on bridges was “not warranted based on the projected cost of installation
and the collateral safety problems which would be created.” Id. at 571 (citing 43 Fed.
Reg. 10586 (Mar. 14, 1978)). The finding of preemption in Norfolk & Western
Railway Co. is strictly limited to regulations requiring walkways on bridges. Id. In
Seaboard System Railroad, the Indiana Court of Appeals held that the state public
service commission was preempted from acting on a complaint concerning walkway
conditions along roadbeds between Bloomington, Indiana and Louisville, Kentucky. 
487 N.E.2d at 469. The complaint urged the commission to “recommend standards
for the construction and maintenance of walkways to protect the safety of
employees.” Id. at 468. The court noted that “[a]lthough unsafe walkways have not
been the subject of specific federal regulations, the regulations as adopted indicate
a congressional determination to regulate the entire railroad area” because
“[w]alkways are part of the track structure and rail system that in general present an
area preempted by the [FRA].”


 Id. at 469. The court concluded that the condition
of the walkways did not present “a distinctively local safety hazard which would
authorize state action under section 434.” Id. Similarly, in Baltimore & Ohio
Railroad Co., the Indiana Court of Appeals held that the state public service
commission was preempted from acting on a complaint alleging that inadequate
pumping, lack of good cross ties, ballast, and poor drainage had created muddy
conditions that were hazardous to railroad employees. 398 N.E.2d at 1362. The court
held that “the issuing of regulations dealing with track structure and roadbed,
although not dealing specifically with the muddy conditions” were “sufficient to
demonstrate an intent by the federal government to regulate the entire area associated
with track structure and track roadbed.” Id. at 1363. We do not read these cases from
the Indiana Court of Appeals as indicating that any and all FELA claims brought by
an individual employee that in any way relate to walkway conditions or ballast size
are automatically precluded. To the extent these cases can be interpreted to hold as
such, we must respectfully disagree. 
          We conclude that the Mopac cases are not dispositive of Hendrix’s FELA
negligence claims. The PTRA asserts that “[o]ne of the lessons taught by Mopac I
and Mopac II is that efforts to enlarge or impose duties on a railroad beyond those
created by the FRA regulations are preempted.” Thus, the PTRA asks this court to
hold, based on Mopac I and II, that a railroad employee cannot seek to impose any
duty on his employer beyond those imposed by federal regulations promulgated under
the FRSA. However, such a holding would eviscerate the rights of a railroad
employee to bring a FELA action against his railroad employer for negligence in the
workplace. A careful reading of the Mopac cases reveals that these cases do not
support the PTRA’s far reaching position. In Mopac I, the Fifth Circuit “held that
summary judgment was inappropriate with regard to [the Texas regulation governing
walkways] because there existed ‘a material fact issue concerning the
interrelationship between the state walkway requirement and federal track
regulations.’” Mopac II, 948 F.2d at 181 (quoting Mopac I, 833 F.2d at 575). In
Mopac II, in conducting its review of the trial court’s findings for clear error, the
Fifth Circuit emphasized that both the railroad and the commission presented
“convincing evidence” in the form of expert testimony concerning the
interrelationship of the federal regulation and the proposed state regulation. Id. at
184. Specifically, the railroad’s expert testified that “in order to accommodate the
walkways required by section 5.619, the track support structures would have to be
enlarged” and that “the smaller material mandated by the state walkway regulation,
during regular maintenance procedures, would mix with the larger material under the
track” and “cause drainage problems and weaken the ability of the track structure to
support train traffic.” Id. at 183–84. The commission’s experts testified that
“walkways are not an integral part of the track structure because they do not bear the
load created by the train traffic,” that “federal regulations apply only to traffic bearing
portions of the roadbed,” and that “there would be no drainage problem because the
material used in constructing the walkways would be permeable.” Id. The Fifth
Circuit’s actual holding is quite limited because it merely noted that the district court
found the railroad’s evidence more persuasive, more credible, and more convincing,
and that it could not say “that the district court’s choice [was] clearly erroneous.” Id.
at 184.
          Thus, as recently noted by the United States District Court for the Southern
District of Texas, the Mopac decisions direct trial courts “to avoid resolving this type
of preemption issue on summary judgment.” Fernow v. Burlington N. & Santa Fe Ry.
Co., 109 F. Supp. 2d 678, 680 (S.D. Tex. 2000). In Fernow, a railroad employee
alleged that he was injured as a result of his employer’s negligence in failing to
provide a safe working environment when a poorly maintained walkway, located
away from the railroad track and embankment, caused him to fall and injure himself. 
Id. at 678–79. The employee also alleged that the railroad failed to provide a
reasonably safe walkway in accordance with provisions in the Arizona Administrative
Code. Id. at 679. The Fernow court stated that, based on the record before it, it was
“uncertain whether Arizona’s walkway specifications require the railroad to
strengthen or enlarge the roadbed beyond federal requirement, or alternatively
whether the regulations contravene federal law.” Id. at 681 n.2. The court further
stated that “[t]o answer such questions, the parties will need to present testimony
from railroad engineers, safety inspectors, and the like.” Id. (citing Whitley v. S. Pac.
Transp. Co., 902 P.2d 1196, 1204 (Or. 1995)). 
          Finally, the PTRA argues that “negative preemption of ballast regulation also
exists by virtue of the FRA’s response to the Rail Safety Enforcement Act of 1992.”
The PTRA asserts that the FRA revisited its regulation of track safety standards from
1992 until 1997 and that the FRA determined that the ballast regulation in section
213.103 should remain as currently written. The PTRA contends that this is evidence
of the FRA “affirmatively evaluating and occupying the field of track and walkway
ballast specifications, which leaves no room for inconsistent determinations by the
courts or juries.” Like the Fifth Circuit in Mopac I, we reject the PTRA’s contention
that the FRA, by declining to promulgate various walkway regulations, has
“specifically intended to ‘cover the subject matter’ of walkways so as to preempt state
regulations.” Mopac I, 833 F.2d at 575. In Mopac I, the court reasoned that the
FRA’s decision not to promulgate specific track walkway provisions did not suggest
“that the FRA has decided as a matter of policy that walkway regulations must be
national in character and must preempt state action.” Id. at 576. We agree with this
reasoning, and conclude that the Secretary of Transportation’s failure to promulgate
regulations that address walkway conditions or the size of ballast in rail yards does
not automatically preclude, as a matter of law, claims brought by Hendrix under
FELA that are in any way related to walkways and ballast. 
          Like the court in Fernow, we note that the record before us is devoid of
testimony from railroad engineers and safety inspectors concerning the issues that
underlie the preemption inquiry and we are unable to determine from the record
whether the railroad would be required to strengthen or enlarge the roadbed beyond
federal requirements or in contravention of federal law in order to address or remedy
the complaints made by Hendrix related to the ballast in the rail yard walkway and
the general rail yard conditions. We recognize that, in considering whether Hendrix’s
claim is preempted, we should not simply analyze the federal regulations in terms of
their “precise safety concerns.” However, the FRSA does not preclude, as a matter
of law, any and all employee FELA claims that relate to or touch upon walkway
conditions and the size of rail yard ballast. Accordingly, we hold that the trial court
erred in granting summary judgment on the ground that Hendrix’s FELA claims are
precluded by the FRSA.
          We sustain Hendrix’s first issue.Non-Ballast Claims
          In his second issue, Hendrix contends that the trial court erred in granting
summary judgment as to his other “causes of action and theories of recovery” not
addressed in the PTRA’s summary judgment motion. Appellant notes that he “pled
specific acts of negligence under the FELA other than those related to ballast and safe
walkways.” In response, the PTRA contends that Hendrix’s own testimony
“established that the sole cause of his injuries was a claim precluded by federal law”
and that “Hendrix failed to present any argument or any evidence regarding any other
alleged cause.” 
          A motion for summary judgment must stand or fall on the grounds expressly
presented in the motion. Tex. R. Civ. P. 166a; Cincinnati Life Ins. Co. v. Cates, 927
S.W.2d 623, 625 (Tex. 1996); Perry v. Greanias, 95 S.W.3d 683, 700 (Tex.
App.—Houston [1st Dist.] 2002, pet. denied). “We are restricted to reviewing the
propriety of the granting of the summary judgment on the basis of the grounds
actually asserted in the motion for summary judgment.” Cates, 927 S.W.2d at 626;
Perry, 95 S.W.3d at 700–01. It is reversible error to grant a summary judgment
motion on a claim not addressed in the motion. Chessher v. Sw. Bell Tel. Co., 658
S.W.2d 563, 564 (Tex. 1983); Perry, 95 S.W.3d at 701. 
          Here, the sole issue presented by the PTRA’s summary judgment motion was
whether Hendrix’s “FELA allegations of improper ballast [were] preempted by the
FRSA.” In the conclusion of its motion, the PTRA repeated its specific contention
that Hendrix’s “ballast claims concerning the nature and size of the ballast” were
preempted. Contrary to the PTRA’s assertion, Hendrix’s allegations concerning the 
ballast were not the “sole basis of Hendrix’s suit.” In Hendrix’s third amended
petition, Hendrix repeated his initial allegations, made more specific allegations
concerning the PTRA’s alleged negligence in regard to the size of the ballast in the
rail yard walkway, and added allegations that the PTRA was negligent in pressuring
switching crews to work faster, reducing crew sizes and overworking crew members,
sending Hendrix back to work with a weak ankle, abandoning certain safety rules,
failing to hire a sufficient number of switchmen, and failing to provide Hendrix with
the necessary equipment in order to perform his job. The PTRA’s summary judgment
motion did not address these claims, but instead focused solely on the issue of
whether Hendrix’s ballast claims were preempted. Contrary to the PTRA’s assertion,
Hendrix was not required to raise a fact issue or present evidence concerning his non-ballast claims in response to the PTRA’s summary judgment motion, which, by its
plain terms, did not address the non-ballast claims. Because the PTRA’s summary
judgment motion did not address Hendrix’s non-ballast claims, we hold that the trial
court erred in granting the PTRA’s summary judgment motion as to his non-ballast
claims.
          We sustain Hendrix’s second issue.
          Conclusion
          We reverse the judgment of the trial court and remand for further proceedings
consistent with this opinion.
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Chief Justice Radack and Justices Jennings and Alcala.