Opinion issued July 1,
2010


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00109-CV

———————————

JOHNNY
GONZALES AND ROBERT MILLER, APPELLANTS

V.

PEARLINE KELLEY, INDIVIDUALLY
AND AS REPRESENTATIVE OF THE ESTATE OF DARYL DWAYNE KELLEY, DECEASED, APPELLEE



 



 

On Appeal from the 334th District
Court

Harris County, Texas

Trial Court Case No. 2008-02201



 



 

MEMORANDUM OPINION

          Appellants,
Johnny Gonzales and Robert Miller, appeal the trial court’s interlocutory order
denying their motion for summary judgment based on official immunity.  See Tex. Civ. Prac. & Rem. Code Ann. §
51.014(a)(5) (Vernon 2008).  Because appellants
carried their burden of proving their affirmative defense of official immunity
as a matter of law and appellee, Pearline Kelley, individually and as representative
of the estate of Daryl Dwayne Kelley, deceased, failed to meet her
corresponding summary-judgment burden, we reverse and render judgment that
appellee take nothing by her claims against appellants.  

Background

          The
underlying suit arises from the death of 29-year-old Daryl Dwayne Kelley (“Daryl”)
on January 13, 2006.  At the time of his
death, Daryl was incarcerated in the Harris County Jail and suffered from
bipolar disorder.  

          Daryl had been arrested on December
30, 2005 for unauthorized use of a motor vehicle and booked into the Harris
County Jail.  On January 12, 2006, Daryl had
not eaten or taken his medication for two days. 
The Harris County Sherriff’s deputies, who work as correctional officers
at the jail, also had observed Daryl banging his head on the door and on the walls
of his cell.  A determination was made
that Daryl should be moved to the jail clinic for an evaluation.  

          Due to the inmate’s history of mental
illness and his large size—Daryl weighed approximately 300 pounds—a team of
four deputies was assembled to move Daryl to the clinic.  The move proved to be difficult.  When the team entered his cell, Daryl struck
one of the deputies and charged out of the cell.  The deputies grabbed Daryl and struggled with
him.  Daryl continued to resist aggressively
and struggle with the deputies.  The
deputies ultimately placed leg shackles and handcuffs on Daryl.  They transported him on a stretcher to the
clinic.  Daryl stayed overnight in the
jail infirmary in a padded cell.

          The next day, January 13, 2006, a
determination was made that Daryl should be transferred to the Mental Health
and Mental Retardation Assessment (“MHMRA”) unit for observation.  Appellant, Johnny Gonzales, a sergeant with
the Harris County Sherriff’s Office, was assigned to supervise the team that
would move Daryl.  Gonzales’s superior
advised him that Daryl had been difficult to move the previous day.    

Gonzales
assembled an emergency response team of five deputies to assist in Daryl’s
transfer.  Among the team was appellant,
Robert Miller, a deputy with the Harris County Sherriff’s Office.  Gonzales assigned to Miller the
responsibility of using a taser device if necessary to subdue Daryl during the
cell transfer.  No other team member
carried a taser during the transfer.  

          At approximately 2:22
p.m., the team lined up outside Daryl’s cell. 
Gonzales ordered Daryl to turn around and lie face down.  Daryl did not comply.  Instead, Daryl took an aggressive stance, shouted
obscenities, and said, “Come on and kill me.” 
As Gonzales opened the cell door, Miller pointed the taser at Daryl to
encourage him to comply with Gonzales’s commands.  Daryl raised his hands in a combative manner,
and Miller deployed the taser.  The taser
probes did not make good contact with Daryl’s body, and Daryl continued to
resist the team’s efforts to subdue him. 


          Miller then disengaged the probe cartridge
from the taser to enable him to use the device in the “drive stun” mode.  In this mode, the taser operator discharges
the device directly against the body of the subject rather than shooting the taser’s
probe projectiles into the subject’s body. 


After the
initial taser deployment, Daryl continued to struggle with the deputies, and Miller
“drive stunned” Daryl two times with the taser. 
The deputies restrained Daryl with handcuffs and leg irons and placed
him on a gurney.  As the deputies
transported him, Daryl continued to struggle. 


Another
team member, Deputy Hazeslip, rode on top of the gurney to secure Daryl’s legs
during the transport.  Daryl continued to
resist and nearly threw Deputy Hazeslip from the gurney.  Deputy Miller again drive stunned Daryl with
the taser.  

Sergeant
Gonzales told Deputy Miller to give the taser to another team member, Deputy
Doyle, who was positioned differently than Deputy Miller relative to Daryl.  Deputy Doyle also deployed the taser.  Once they arrived at the MHMRA unit, a nurse injected
Daryl with Benadryl, Haldol, and Ativan. 


          The gurney on
which the deputies were transporting Daryl would not fit through the door of the
cellblock on the MHMRA unit.  To get
through the door, the deputies lifted the mattress from the gurney with Daryl
on it.  Daryl continued to struggle.  Gonzales obtained the taser from Deputy Doyle
and discharged it twice in the drive stun mode into Daryl’s shoulder.  

          The team ultimately placed Daryl in
his new cell.  A short time later, a nurse
assessed Daryl’s medical condition and found that his pulse was thready.  Daryl was transported to the hospital where he
died at 4:16 p.m. 

An autopsy
revealed Daryl’s cause of death to be “psychotic delirium associated with
hypertensive cardiovascular disease.” 
The medical examiner found the manner of death to be “natural.”  

Daryl’s
mother, Pearline Kelley (“Ms. Kelley”), sued Sergeant Gonzales and Deputy
Miller for civil assault.  Ms. Kelly
alleges that the deputies used “excessive force, namely the multiple shocks . .
. with the taser gun,” which caused her son’s death.  Ms. Kelley also sued Harris County and Taser,
Inc. for various causes of action.  

Sergeant
Gonzales and Deputy Miller (“appellants”) answered and filed a motion for
summary judgment.  Appellants asserted
that they were entitled to summary judgment on Ms. Kelley’s assault claim based
on the affirmative defense of official immunity.  To support summary judgment, Sergeant
Gonzales and Deputy Miller each offered his own affidavit.  

Ms. Kelley responded
by asserting that each appellant had not acted in good faith—a necessary
element of official immunity—when he had tasered her son.  In support of her response, Ms. Kelley
offered the affidavits of three jail inmates.  The inmates had witnessed Daryl’s first
transfer from his cell to the infirmary on January 12, 2006, the day before the
incident made the basis of this suit.  Ms.
Kelley’s summary judgment evidence also included the affidavit of Otis Ricks,
an employee of MHMRA, who had been present when the deputies brought Daryl to
the MHMRA unit on January 13, 2006.  

The trial
court denied appellants’ motion for summary judgment.  Appellants filed this interlocutory appeal to
challenge the trial court’s ruling.[1]  Appellants contend in three issues that the
trial court erred when it denied their motion for summary judgment based on
official immunity. 

 

 

 

Summary
Judgment and Official Immunity

A.      Governing
Legal Principles

A movant
seeking traditional summary judgment on an affirmative defense has the initial
burden of establishing entitlement to judgment as a matter of law by
conclusively establishing each element of his affirmative defense.  See Chau
v. Riddle, 254 S.W.3d 453, 455 (Tex. 2008); see Tex. R. Civ. P.
166a(b), (c).  A matter is conclusively
established if reasonable people could not differ as to the conclusion to be
drawn from the evidence.  See City of Keller v. Wilson, 168 S.W.3d
802, 816 (Tex. 2005).  

If the
movant meets his burden, the burden shifts to the nonmovant to raise a genuine
issue of material fact precluding summary judgment.  See Centeq
Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995).  The evidence raises a genuine issue of fact
if reasonable and fair-minded jurors could differ in their conclusions in light
of all of the summary-judgment evidence.  Goodyear
Tire & Rubber Co. v. Mayes, 236 S.W.3d 754, 755 (Tex. 2007).

On appeal,
we review de novo a trial court’s summary-judgment ruling.  See Mann
Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848
(Tex. 2009).  In our review, we consider
all the evidence in the light most favorable to the nonmovant, crediting
evidence favorable to the nonmovant if reasonable jurors could, and
disregarding contrary evidence unless reasonable jurors could not.  See Mack Trucks, Inc. v. Tamez, 206 S.W.3d
572, 582 (Tex. 2006).  

Official
immunity under common law is based on the necessity for public servants “to act
in the public interest with confidence and without the hesitation that could
arise from having their judgment continually questioned by extended
litigation.”  Ballantyne v. Champion Builders, Inc., 144 S.W.3d 417, 424 (Tex. 2004).
 Official immunity is an affirmative defense
that shields government employees from personal liability for the employee’s
performance (1) of discretionary duties, (2) within the scope of the employee’s
authority, (3) undertaken in good faith.  See
Univ. of Houston v. Clark, 38 S.W.3d 578, 580–81 (Tex. 2000); City of Lancaster v. Chambers, 883
S.W.2d 650, 653 (Tex. 1994).  To obtain
summary judgment on the basis of official immunity, the government employee
must prove conclusively each of these elements.  Clark,
38 S.W.3d at 580.  When determining
whether the summary-judgment proof conclusively establishes an
official-immunity defense, we must consider the existence of disputed facts
material to these elements.  See Telthorster v. Tennell, 92 S.W.3d
457, 461 (Tex. 2002).  

In this case, the parties do not dispute that each
appellant performed a discretionary duty within the scope of his authority.  Instead, the parties contest whether each appellant
acted in good faith in his use of force against Daryl, more particularly, in his
use of the taser device against Daryl.  

To determine whether a public official acted in
good faith, we determine whether a reasonably prudent official, under the same
or similar circumstances, could have believed that his conduct was justified
based on the information he possessed when the conduct occurred.  Ballantyne,
144 S.W.3d at 426; Telthorster v. Tennell,
92 S.W.3d at 465.  The standard of good
faith as an element of official immunity is not a test of carelessness or
negligence, or a measure of an official’s motivation.  Ballantyne,
144 S.W.3d at 426.  We measure good faith
in official immunity cases against a standard of objective reasonableness,
without regard to the official’s subjective state of mind.  See id.

The official need not prove that it would have
been unreasonable to take different action, nor that all reasonably prudent
officials would have acted as he did.  See Telthorster, 92 S.W.3d at 465.  The good faith test is not what a reasonable
person would have done, rather it is
what a reasonable official could have
believed.  See Ballantyne, 144
S.W.3d at 426; Telthorster, 92 S.W.3d
at 465.  In other words, an official must prove
only that a reasonably prudent officer, under similar circumstances, might have
reached the same decision.  Telthorster, 92 S.W.3d at 465.  

Thus, to be
entitled to summary judgment, an official must conclusively show that a
reasonably prudent official might have believed the action taken was
appropriate.  See Perry v. Greanias, 95 S.W.3d 683, 697 (Tex. App.—Houston [1st
Dist.] 2002, pet. denied).  Once an official
meets this burden, to defeat summary judgment, the plaintiff must offer
evidence to show that no official in
the defendant’s position could have believed the facts justified his conduct.  See Telthorster,
92 S.W.3d at 465; Perry, 95 S.W.3d at
697.

B.      Good
Faith in This Case

          1.       The Officers’ Proof

          We first must examine the summary
judgment proof to determine whether Sergeant Gonzales and Deputy Miller conclusively
established that a reasonably prudent officer, under the same or similar
circumstances, could have believed that his use of force, namely the use of the
taser device, was justified.  To show
good faith, Sergeant Gonzales and Deputy Miller each testified by affidavit in
support of summary judgment.  The officers
recounted the events surrounding the transfer of Daryl from the infirmary to
the MHMRA unit on January 13, 2006.  

Each
officer indicated in his affidavit that he had been made aware that Daryl had a
history of being aggressive and uncooperative with staff.  Sergeant Gonzales testified that, when the
team arrived at the cell, he ordered Daryl to turn around and lie face down.  Daryl refused and became “verbally aggressive,”
stating, “What the fuck is this?” and “Come on and kill me.”  Sergeant Gonzales again ordered Daryl to turn
around and lie down, but he refused.  When
the team entered his cell, Daryl “raised his hands” in a combative manner, and
Deputy Miller then deployed the taser.  

Deputy
Miller similarly testified that Daryl would not comply with Sergeant Gonzales’s
repeated orders to turn around and lie down. 
Instead, Daryl “took an aggressive stance as the door was opening.”  Deputy Miller testified that, when Daryl
“raised his hands,” he had to determine how to respond.  Deputy Miller responded by deploying the
taser.  Deputy Miller described how Daryl
had turned as he was deploying the taser and how Daryl had then fallen in the
cell.  Both officers testified that the
taser probes had not made good contact with Daryl’s body.

          With regard to his further use of the
taser, Deputy Miller offered the following testimony:

All team members had difficulty physically securing
Mr. Kelley.  Mr. Kelley became extremely
aggressive and violent while the Team attempted to secure him.  I had disengaged the cartridge from the Taser
in order to use the drive stun method and not “tase” any of the team members
who were on the wires.  Mr. Kelley
displayed such strength that he began to lift members of the Team off the floor
during the struggle.  Again, I had to use
my discretion to determine the response to be made to Mr. Kelley’s
combativeness.

 

I took up a position near
Mr. Kelley’s left shoulder area and deployed the Taser in the drive stun mode
to Mr. Kelley’s left shoulder blade.  The
purpose of the “drive stun” mode was to obtain Mr. Kelley’s compliance.  Mr. Kelley seemed to calm down long enough for
the team leader, Deputy Tullos, to ask if all team members were secure, meaning
that they were able to control the particular body part of Mr. Kelley to which
they were assigned.  However, after each
member of the team had acknowledged that Mr. Kelley was under control, he
became aggressive again by pushing his legs out and thrashing his head from left
to right.  Mr. Kelley began yelling
loudly and continuing to resist.

 

I moved into a different
position beside Mr. Kelley’s right leg using my discretion to determine the
response to be made to Mr. Kelley.  I
deployed the Taser system in drive stun mode to Mr. Kelley’s right buttock area
to gain compliance.  Mr. Kelley appeared
to temporarily stop the resistance.  At
that time, I assisted Deputy Hazeslip in securing Mr. Kelley’s legs by placing
leg restraints on him.

 

. . . .

 

Deputy Hazeslip rode on the
top of the gurney, securing both Mr. Kelley’s legs while in transit.  As soon as the Team moved around the corner of
the hallway, Mr. Kelley became aggressive by trying to resist.  Mr. Kelley’s resistance moved Deputy Hazeslip backwards
and he was almost thrown off the gurney.  Again using my discretion to determine the response
to be made to Mr. Kelley’s aggression, I deployed the Taser system by drive
stunning Mr. Kelley’s right buttock.  The
purpose of the drive stun was to gain Mr. Kelley’s compliance.  I then supported Deputy Hazeslip by holding
on to his belt and the back of his vest.  Once Mr. Kelley seemed to take a breath and
calm down.  I released my hold on Deputy
Hazeslip.

 

Sergeant
Gonzales offered the following testimony regarding the events surrounding
Deputy Miller’s use of the taser and his own use of the taser: 

After he deployed the Taser,
Deputy Miller entered Mr. Kelley’s cell and tripped as he went in.  The rest of the Team continued into the cell,
and attempted to restrain Mr. Kelley, who was violently resisting the Taser and
the use of physical control tactics by the Team.  In other words, Mr. Kelley was violently
resisting the officers’ attempts to bring him under control physically so he
could be transported.  Deputy Miller
disengaged the Taser cartridge from the Taser and attempted to apply a drive
stun to Mr. Kelley.  A drive stun is
applied directly to the subject’s body, without the use of the Taser probes.  This is a technique used to bring a subject under
control.  The other members of the Team
were struggling with Mr. Kelley and Deputy Miller was unable to apply the drive
stun immediately. Deputy Miller was finally able to move in and apply
approximately three drive stuns in short durations after the initial deployment
of the Taser probe.  Mr. Kelley continued
to violently resist the Team, at one point kicking two Team members off him as
they attempted to physically subdue and secure him.  The Team continued to use proper pressure
point and control tactics to secure Mr. Kelley, and ultimately, Mr. Kelley was
secured after a few minutes.  The Team
sounded off; indicating that all members had control of their assigned body parts.

 

Once all Team members
sounded off, the restraints were to be applied.  I noticed several members were having
difficulty applying the handcuffs at which time I gave the order to double
handcuff Mr. Kelley.  A second pair of
handcuffs was applied and secured to each other.  Giving the order to double handcuff Mr.
Kelley was within the scope of my authority as a sergeant and I exercised my
discretion to issue this order.

 

A second pair of handcuffs
was applied, and secured to each other.  After Mr. Kelley was properly secured, the
Team lined him and placed him on a stretcher. Mr. Kelley continued to struggle
as the Team lifted him, almost causing the Team to drop him.

 

After Mr. Kelley was placed
on the stretcher, Deputy Hazeslip had to climb on the stretcher and secure Mr.
Kelley’s legs.  Mr. Kelley started to
resist once again outside of the cell, and the Team stopped the stretcher and
applied pressure point control tactics as I attempted to calm Mr. Kelley down.

 

. . . .

 

Once on the second floor,
the Team had to stop outside of 2C1 for another nurse to administer an
injection of Benadryl, Haldol and Ativan.  After the injection was given, Mr. Kelley told
the nurse “Thank you” and the Team was cleared to move him into his new cell assignment.
 The stretcher [would] not fit into the
cellblock, so I ordered the Team to use the mattress to lift Mr. Kelley.

 

As the Team attempted to
lift the mattress and Mr. Kelley, he became violent and started to struggle
with the Team.  I secured the Taser from
Deputy Doyle, who had previously secured it from Deputy Miller.  I applied two drive stuns in short duration to
Mr. Kelley’s upper left shoulder area.  These
drive stuns had little effect on his violent actions, as he continued to struggle.
 I exercised my discretion in determining
to utilize a drive stun against Mr. Kelley and applying the drive stun was
within the scope of my authority.

 

Both
officers further testified that Daryl continued to struggle as the team arrived
at the new cell.  According to Deputy
Miller, Daryl was “extremely resistive,” using his legs to throw Deputy
Hazeslip from the stretcher.  Deputy
Miller testified that he intervened and attempted to bend Daryl’s legs back
into position by delivering “several hammer fist strikes” to Daryl’s
hamstrings.  Despite these efforts, Daryl
“overpowered” Deputy Miller.  Similarly,
Sergeant Gonzales testified that Daryl continued to resist and “kick[ed] off
two deputies,” despite being shackled.  Each
officer also testified that once inside the cell, Daryl continued to struggle
until the restraints were removed.  

Relevant to
the good-faith analysis, appellant’s summary-judgment evidence showed: 

·       
Sergeant Gonzales and Deputy Miller knew that Daryl had a recent history
of aggression and combativeness toward staff. 

 

·       
Daryl showed immediate aggression and resistance toward the team, which
continued throughout the entire transfer;

 

·       
Daryl was a large 29-year-old man, who demonstrated great strength
against the team;

 

·       
The team had difficulty controlling Daryl throughout the transfer;

 

·       
Daryl was able to offer significant resistance to the team despite being
handcuffed and shackled;

 

·       
Each time the taser was deployed, it was directly and immediately responsive
to an aggressive or unruly behavior by Daryl;

 

·       
Deputy Miller’s deployment of the taser resulted in momentary compliance
by Daryl, which permitted the team to physically secure him;

 

·       
After each taser deployment, Daryl sufficiently recovered to physically
resist the team.

 

In sum, the
officers’ summary-judgment evidence showed that Daryl was a physically large
and strong man with a recent history of aggressive behavior toward staff during
a cell transfer.  The evidence also
showed that the officers used the device in response to specific aggressive
acts by Daryl.  The testimony showed that
each taser deployment by Deputy Miller resulted in momentary compliance by
Daryl that allowed the team to secure him. 
Throughout the transfer, the team had difficulty maintaining control of
Daryl, whose conduct was described by the officers as violent, aggressive, and
combative.  Despite being handcuffed and
shackled, Daryl offered significant resistance to the team.  During the transfer, Daryl did not exhibit
outward signs of harm from being tasered, as shown by his continued resistance
after each taser deployment.

Based on
the evidence submitted, we conclude that Sergeant Gonzales and Deputy Miller conclusively
established that a reasonably prudent officer, under the same or similar
circumstances, could have believed that his use of force, namely the use of the
taser device, was justified.[2]  See Telthorster, 92 S.W.3d
at 465.  We hold that Sergeant Gonzales
and Deputy Miller met their summary-judgment burden to conclusively establish
good faith.  See Hidalgo County v.
Gonzalez, 128 S.W.3d 788, 795 (Tex. App.—Corpus Christi 2004, no pet.)
(holding that sheriff deputy proved good faith for official immunity purposes in
summary judgment proceeding involving claim that deputy injured plaintiff’s
wrist with handcuffs when deputy transferred plaintiff to mental health
facility); Watt v. Tex. Dept. of Criminal
Justice v. Watt, 949 S.W.2d 561, 566 (Tex. App.—Waco 1997, no writ) (reversing
denial of summary judgment sought on official immunity ground because prison
employees proved that they acted in good faith in using force against inmate in
cell transfer that resulted in inmate’s death).

2.       Ms.
Kelley’s Proof

          To
controvert appellants’ proof, Ms. Kelley had to show that no reasonable officer in Sergeant Gonzales’s and Deputy Miller’s position
could have believed that the circumstances justified his conduct.  See Telthorster, 92 S.W.3d at 466–67.  Ms. Kelley failed to meet this burden.

          In support of her response to
appellants’ motion for summary judgment, Ms. Kelley offered the affidavit
testimony of Otis Ricks, an MHMRA employee. 
Ricks saw the team arrive at the mental health unit with Daryl on January
13, 2006.  Ricks testified that he
observed one of the team members use his fist to strike Daryl six times in the
ribs.  In her response, Ms. Kelley
contends that appellants’ summary-judgment evidence failed to “explain[] the
need to deliver closed fist body blows to Kelley.”  Ricks, however, did not identify either
Sergeant Gonzales or Deputy Miller as the officer who punched Daryl.  Ricks testified that he saw six officers
escorting Daryl.  Five of the six officers
wore helmets with visors.  Ricks stated
that the visors made it difficult to see the faces of the officers.

Ms. Kelley
also offered the affidavit testimony of three inmates of the Harris County Jail.  Each inmate testified that he had witnessed a
group of deputies physically and verbally abusing Daryl on January 12, 2006,
the day that Daryl was transferred to the infirmary and the day before the
incident made the basis of this suit.  However,
none of the inmates identified Sergeant Gonzales or Deputy Miller as a participant
in the abuse.  To the contrary, the
record reflects that neither Sergeant Gonzales nor Deputy Miller was among the
team members who conducted Daryl’s transfer to the infirmary on January 12,
2006.  

In her
summary-judgment response, Ms. Kelley also offers the following argument: 

The record demonstrates that HCSO Deputy Miller
tasered Kelly four separate times during the same incident for a total of 19
seconds, during the same incident, HCSO Deputy Gonzales tasered Kelley twice
for a total of 7 seconds.  In all, Kelley
was tasered for seven times for a total at 31 seconds during the same episode.  The multiple Taser deployment on Kelley was
clearly disproportionate to the exigencies of the situation and resulted in
injury to Kelley.

 

It is patently unreasonable
for Defendants to claim that an “unarmed” Kelley was combative, remained a
threat and was continuing to resist even after he was hand cuffed and leg
shackled. That simply strains all credulity.

 

As
discussed above, appellants’ evidence showed that a reasonably prudent officer,
under the same or similar circumstances, could have believed that it was
necessary to use the taser in the manner that it was used here.  The evidence showed that each taser
deployment immediately followed an aggressive or unruly act by Daryl.  The evidence also showed that Daryl was
effective in his resistance against the officers even after he was handcuffed,
shackled, and given sedation.[3]  

In
contrast, Ms. Kelley’s response is not supported by any evidence that
controverts appellants’ establishment of good faith.  We note that Ms. Kelley offered no expert
testimony to support her assertion that appellants’ conduct was “patently
unreasonable” based on the number of taser deployments and the fact that Daryl
was in restraints and medicated when tasered.  In short, Ms. Kelley has failed to meet her
burden to show that no reasonable officer would have acted as appellants did
under the same or similar circumstances. 
See Telthorster, 92 S.W.3d at
465.

We sustain
appellants’ issues.

Conclusion

Appellants’
summary judgment evidence conclusively establishes, and Ms. Kelley fails to
controvert, that Sergeant Gonzales and Deputy Miller each acted in good faith
when he used force, namely using the taser, against Daryl.  Accordingly, we reverse the order of the trial
court to the extent that it denies appellants’ motion for summary judgment and
render judgment that Ms. Kelley take nothing against appellants.                                                                                                     

 

 

 

 

Laura C. Higley

                                                                   Justice


 

Panel consists of Justices Keyes, Hanks, and Higley.











[1]           We have jurisdiction over this
interlocutory appeal because it is an appeal from the denial of a motion for
summary judgment based on official immunity. 
See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(5)
(Vernon 2008) (permitting appeal of an order denying a motion for summary
judgment that is based on assertion of immunity by an individual who is an
officer or employee of the state or a political subdivision of the state).  In the same instrument as appellants’ motion
for summary judgment, Harris County also filed for summary judgment.  When it denied appellants’ motion for summary
judgment, the trial court also denied Harris County’s motion for summary
judgment.  The denial of Harris County’s
motion for summary judgment is not part of this appeal.





[2]           In her brief, Ms. Kelley asserts that
the principles enunciated in Telthorster do not apply to this
case.  Telthorster involved a lawsuit arising from injuries allegedly
inflicted by a police officer making an arrest. 
Ms. Kelley points out that the Telthorster
court remarked, “A high risk of liability in such a situation would likely
compel arresting officers to act hesitantly when immediate action is required,
subjecting themselves and the public to unnecessary ‘risks, and seriously
hamper[ing] their efforts to apprehend dangerous criminal suspects.’”  Telthorster
v. Tennell, 92 S.W.3d 457, 464 (Tex. 2002) (quoting United States v. Merritt, 695 F.2d 1263, 1274 (10th Cir. 1982)).  Ms. Kelley contends, “In the instant case, no
facts exist to suggest immediate action by police officers was required, that
Kelley was a dangerous criminal, and clearly there were no risks to the general
public.”  We begin by noting that, in
making the cited remark, the supreme court in Telthorster was determining whether to apply the need/risk analysis,
which had been historically applied when determining good faith in cases
involving high-speed pursuits, to determining an officer’s good faith in cases
in which the injury arose from an arrest. 
See id.  In any event, considerations similar to
those in Telthorster also exist in
this case.  Here, immediate action by the
officers was also necessary.  The record
shows that Daryl was a mentally ill man who was being transferred to the mental
health unit for observation.  The record
reflects that Daryl had a history of aggressive behavior toward staff and was
in a psychotic state.  During the
transfer at issue, Daryl acted aggressively toward the officers from the moment
they approached his cell until the time the team placed him in his new
cell.  Under such circumstances, an
officer must be able to act immediately to safeguard himself, his team members,
the inmate, and other inmates, without fear of liability.





[3]           On appeal, Ms. Kelley complains of
appellants’ affidavit testimony on the ground that appellants are interested
witnesses whose testimony cannot be readily controverted.  She points out that the uncontroverted,
self-serving affidavit from an interested witness may serve as basis for
granting summary judgment only if the evidence is “clear, positive, direct,
otherwise credible, free from contradictions and inconsistencies, and could
have been readily controverted.”  See Trico Techs. Corp. v. Montiel, 949
S.W.2d 308, 310 (Tex. 1997).  However, an
objection asserting that the affiant is an interested witness is an objection
to a defect in form in the affidavit and must be preserved in the trial court.  Ahumada
v. Dow Chem. Co., 992 S.W.2d 555, 562 (Tex. App.—Houston [14th Dist.] 1999,
pet. denied).  Because Ms. Kelley failed
to raise or to obtain a ruling on this objection in the trial court, it has
been waived.  See Tex.
R. App. P. 33.1.  Moreover, the
law is clear that good faith may be established by the official’s own affidavit.  See Barker
v. City of Galveston, 907 S.W.2d 879, 888 (Tex. App.—Houston [1st Dist.] 1995,
writ denied).